Ralph WEGENER, Plaintiff-Appellant,

v.

ST. LOUIS COUNTY TRANSIT COMPANY, a Corporation, Defendant-Respondent.

No. 48451.

Supreme Court of Missouri,

En Banc.

June 11, 1962.

N. Murry Edwards, St. Louis, Ninian M. Edwards, Clayton, for appellant.

William M. Corrigan, St. Louis, for respondent.

HOUSER, Commissioner.

This is a suit for $25,000 damages for personal injuries alleged to have been sustained by Ralph Wegener when the automobile he was driving and a St. Louis County Transit Company bus collided in the intersection of Lindell Boulevard and DeBaliviere Avenue in the City of St. Louis. A trial jury returned a verdict for defendant. Plaintiff has appealed from the ensuing judgment.

Lindell Boulevard runs east-west; DeBaliviere runs north-south, with this qualification, that there is a pear-shaped island 56 feet wide at its extreme width, located in DeBaliviere north of the north line of Lindell. This divides DeBaliviere into two segments and causes the west segment of DeBaliviere (for southbound traffic) to run in a southwest direction and the east segment of DeBaliviere (for northbound traffic) to run in a northwest direction. Traffic referred to as "southbound on DeBaliviere" therefore actually travels in a southwest direction, due to the pear shape of the center island north of Lindell. It is approximately 180 feet from the east curb line of the east segment of DeBaliviere to the west curb line of the west segment of DeBaliviere on the north side of Lindell. There is also an island 100 feet long running parallel to and south of Lindell. The north line of this island coincides with the south line of Lindell. Defendant's bus was westbound on Lindell; plaintiff's automobile southbound on DeBaliviere, at the time of collision. Electric stop and go signals control traffic at the intersection. Lights controlling westbound traffic on Lindell were located on the northeast and southwest corners of the intersection and on the north and south islands. Lights controlling south-bound traffic on DeBaliviere were located on the northwest and southwest corners, and on the west end of the south island. The sequence: green to amber to red to green, etc. When the lights for westbound traffic were on green, the lights for south-bound traffic were on red. Then the lights for westbound traffic would go from green to amber for 2½ seconds. Then the lights for westbound traffic would go from amber to red, and the entire intersection (except the right turn off Lindell) would stay red for 2 more seconds. Next, the lights for southbound and northbound DeBaliviere traffic would turn green. When the lights for southbound traffic on DeBaliviere were on green the lights for westbound traffic on Lindell were on red. There were 3 westbound lanes of traffic on Lindell at this intersection. Lindell is 50 feet wide both east and west of the intersection. At their narrowest (where the pear-shaped island reaches its widest bulge) the east and west segments of DeBaliviere are 30 feet wide. These narrowest points are approximately 25 feet north of the north line of Lindell. A perfect curve describes these points and a point on the north line of Lindell. The east and west segments of DeBaliviere at the north line of Lindell are approximately 86½ feet wide. It is 86½ feet each way from the point at which the south side of the pear-shaped island touches the north line of Lindell, to the east and west curb lines (extended) of DeBaliviere.

On April 14, 1958 at 12:15 P.M. the streets were wet. There was no fog or mist; visibility was good. Plaintiff was driving south on DeBaliviere in the lane nearest the west curb of DeBaliviere, intending to cross Lindell and enter Forest Park. The bus was driving west on Lindell, intending to go through the intersection and on west on Lindell. The two vehicles collided in the lane the bus was using, approximately 4 feet east of the west line of the west segment of DeBaliviere (extended). The point of collision was about 85 feet west of the center of the intersec-

tion, and about 195 feet west of the traffic light for westbound traffic located on the northeast corner of the intersection.

Plaintiff's petition contained five assignments of primary negligence, and charged negligent failure to stop, slacken speed, sound a warning, or turn and swerve under the humanitarian doctrine.

On this appeal plaintiff makes only one point: error in refusing to give plaintiff's Instruction No. A, which would have submitted the case to the jury under the humanitarian doctrine on the theory of defendant's failure to warn, or in the alternative, failure to slacken speed. The trial court submitted the case on primary negligence: failure to stop the bus for a red traffic light as the bus entered the intersection of Lindell and the southbound lane of DeBaliviere.

Plaintiff's proof on the merits (his own testimony and that of Mr. and Mrs. Theodore Kopecky) tended to establish the following set of facts: Three automobiles, proceeding south on the west segment of DeBaliviere, approached Lindell and stopped at the intersection because the red light was against them. Plaintiff's Ford automobile was in the west or curb lane. The Kopecky station wagon was in the middle. A third automobile was in the east lane, to Kopeckys' left. The station wagon and the third car were lined up even, but the front of plaintiff's Ford was farther north, e. g., behind the line of the other two vehicles. Because of the position of the three cars after they stopped plaintiff could not see the entire intersection to his left or east, but could see only about 92 feet east, to a point roughly even with the traffic light on the north island. Mrs. Kopecky, driver of the station wagon, looked to the east. She could see the bus, quite a distance back (east) of the stop light, coming west on Lindell. Not "worrying about him" because "he had the red light," Mrs. Kopecky started forward when the light for southbound traffic turned green,

after the car to her left started forward. When the Kopecky station wagon started forward plaintiff took his foot off the brake, put it on the accelerator and proceeded out into the intersection. As he started up, plaintiff looked to his left (east) as far as he could see, but did not observe any westbound traffic. After the station wagon had gone forward 5 to 10 feet and while the station wagon was traveling 5 to 10 m. p. h., Mr. Kopecky, sitting in the front seat on the right side, saw the bus coming through the intersection and then 35 to 50 feet east of the station wagon. Kopecky shouted to his wife, who brought the station wagon to a stop very suddenly. The car to Kopeckys' left had already stopped. When the station wagon stopped plaintiff's Ford went past it, whereupon plaintiff glanced up, saw the bus, applied his brakes and tried to turn, but did not have sufficient time. The bus, going 25 m. p. h., was then just a few feet away from plaintiff—10 or 15 feet east of the line of travel of plaintiff's automobile. Plaintiff's Ford was 8 to 10 feet into the intersection when plaintiff applied his brakes. The brakes on the Ford were in good operating condition, but it was too late to avoid a collision. The right front of the bus struck the left front half of plaintiff's Ford. Plaintiff estimated the speed of the bus at time of collision at 25 m. p. h. As to the length of the run plaintiff made from his stationary position to the point of collision: Plaintiff estimated the distance from the front of his automobile to the north line of Lindell, as he was waiting for the green light, at 5 or 6 feet. Kopecky put plaintiff's automobile "half a car length back" of the station wagon, and the front of the station wagon 5 to 10 feet north of the north line of Lindell, as the cars were waiting at the stop. Plaintiff estimated the distance his Ford traveled from his stopped position to the point of impact at from 12 to 15 feet. Kopecky judged this distance to be "a car length and a half," and estimated a car's length at 17 to 18 feet. Plaintiff's evidence as to the length of

plaintiff's run thus varied from 12 to 27 feet. The bus driver did not blow the horn. The impact turned plaintiff's Ford abruptly from its southwest course, and threw it to the right, in the same direction the bus was going. It came to a stop faced west. The bus traveled about 15 or 20 feet, plaintiff's Ford 10 or 12 feet, after the collision. Plaintiff testified that his maximum speed before the collision was 5 m. p. h.; that he was traveling "not more than five miles an hour"; that he could stop his Ford under the existing conditions at 5 m. p. h. in about 8 feet. Kopecky gave as his opinion that at the time the bus passed the front of the station wagon the speed of the bus was between 20 and 25 m. p. h. A traffic expert testified that at 15 m. p. h. a vehicle travels approximately 21 feet per second; that at 20 m. p. h. it travels 29 feet per second; and that at 25 m. p. h. it travels about 37 feet per second.

Defendant's defense on the merits consisted solely of the testimony of the bus driver, as follows: The bus approached the intersection in the lane nearest the north line of Lindell, at a speed of approximately 15 m. p. h. The electric signals governing westbound Lindell traffic were on green, and the signal on the northeast corner was green when the bus passed that point. When the front of the bus got "practically even" with or perhaps 2 feet east of the signal on the north island the green turned to amber. The speed of the bus then was about 15 m. p. h. As the light turned amber the bus proceeded on through the intersection of Lindell with southbound DeBaliviere, and while crossing the intersection the bus drived observed traffic, sitting still, in the western segment of DeBaliviere. He saw that there were two cars in the middle lane, and about four cars in the west or curb lane. Plaintiff's automobile was in the west lane, the curb lane. The bus driver observed the automobiles southbound on DeBaliviere start to move, and he testified that at the time they did so the bus was

"better than halfway across the intersection" on the southbound DeBaliviere side, i. e., better than halfway across "the west part" of the intersection—"the southbound DeBaliviere side there." He said he observed the light on the northwest corner turn red when the front of the bus was about 55 feet west of the light on the north island. The three southbound vehicles on DeBaliviere started to move approximately at the same time, and at approximately the time the light turned red. The automobiles he observed moving were the *first* cars, "the first one in the inside lane and the curb lane." When these automobiles started up the bus was going approximately 15 m.p.h. The front bumper of the plaintiff's automobile with relation to the north curb line of Lindell, before plaintiff started up, was "between five and ten feet back from the curb,"—"five or ten feet north of the curb line." As soon as he saw the automobile start up the bus driver applied his brakes. The speed of the bus was then about 15 m. p. h. The bus driver estimated the speed of the automobile as it moved toward the north curb line of Lindell, after it started out, at about 5 m. p. h. The bus traveled approximately 40 feet from the time the brakes were applied until it stopped. The collision occurred in the curb lane of traffic, when the bus was 2 feet south of the north curb line and about 5 feet west (east?) of the west curb line. The front of the bus stopped approximately 5 feet west of the west curb line of DeBaliviere (extended). According to the bus driver the bus was "practically dead" still or "had come to a complete stop" when the collision occurred. The bus driver conceded that he did not sound his horn, which was in good working condition. The bus did not slip or skid on the pavement. The bus driver testified that under the conditions then and there existing he could stop the bus at 15 m. p. h. with safety to himself and to the other passengers in "not under 40 feet," and that at 20 m. p. h. he could stop in approximately "a little

less than 50 feet." The bus driver could see plainly ahead and to the side of the bus; the windshield wipers were properly working and there was nothing to "mar" his visibility.

■ Whether plaintiff made a submissible humanitarian case of failure to warn or failure to slacken depends upon whether there is sufficient evidence in this record available to plaintiff to show the time at which plaintiff came into a position of imminent peril, and whether thereafter the bus driver had the time, distance and means available to issue an effective warning or to sufficiently slacken the speed of the bus and thereby avert a collision. Under the evidence, the jury reasonably could have found that plaintiff was oblivious of the approach of the bus and danger of collision. Plaintiff looked to his left, in the direction of the bus, as he started forward, but the bus was not in sight at that time (and therefore must have been more than 92 feet east of the point of impact at that time). Wofford v. St. Louis Public Service Co., Mo.Sup., 252 S.W.2d 529, 531. Plaintiff had the green light in his favor, a circumstance for the consideration of the jury in determining the duty of the bus driver to have discovered plaintiff and to have become aware of his intention to proceed into the intersection. Harrell v. Berberich, 359 Mo. 551, 222 S.W. 2d 733, 735. Plaintiff's Ford started out from zero and attained a maximum speed of 5 m. p. h., apparently in a steady acceleration without diminution. It could be inferred from the evidence that at no time during plaintiff's forward progress did plaintiff look to his left or east, but rather looked straight ahead to the south, until the bus was just a few feet from him—a split second before the collision. Plaintiff gave no indication of any awareness of the approach of the bus until he was 8 or 10 feet out in the intersection. Plaintiff's obliviousness would widen the zone of peril, imposing upon the bus driver the duty to act in avoidance when he saw, or by the exercise of the highest

degree of care could have seen, plaintiff approaching the path of the bus oblivious of the danger and intent upon continuing into its path. The precise point during plaintiff's run at which plaintiff came into a position of imminent peril is not for this Court to fix. Suffice it to say that under the evidence the jury reasonably could have found that plaintiff traveled at least 20 feet from his stationary position to the point of collision; that defendant's bus driver saw plaintiff's moving vehicle start forward on what the bus driver knew was the green light for plaintiff; that the bus driver should have seen that plaintiff was oblivious of the danger and intent on continuing into the path of the bus at or before the time plaintiff's automobile traversed half the 20-foot run; that plaintiff was in a position of imminent peril at or before the time plaintiff's automobile had moved 10 feet from its stationary position.

■ *Of failure to warn:* The jury could have found that plaintiff's average speed over the 20-foot run (commencing at zero and attaining a maximum of 5 m. p. h.) was approximately 2½ m. p. h., or less than 4 feet per second, at which rate it would have taken plaintiff approximately 5 seconds from the time he started forward until the instant of collision. McDonough v. St. Louis Public Service Co., Mo.Sup., 350 S.W.2d 739; Hook v. St. Louis Public Service Co., Mo.App., 296 S.W.2d 123, 127. Plaintiff testified that at 5 m. p. h. he could have stopped in 8 feet and at 4 m. p. h. in less than 8 feet. We take judicial notice of the fact that an automobile with good brakes traveling at 2½ m. p. h. could be stopped almost instantly—within a matter of a very few feet. Johnson v. Kansas City Public Service Co., 358 Mo. 253, 214 S.W.2d 5, 10; Smith v. St. Louis Public Service Co., Mo.App., 252 S.W.2d 83, 85, 86; Hamell v. St. Louis Public Service Co., Mo.App., 268 S.W.2d 60, 64. If plaintiff reached a position of imminent peril at or before his Ford had progressed 10 feet,

and if the bus driver could have discovered his position of imminent peril sometime during the first 2 seconds of that run, there would have been time, allowing ¾-second reaction time to both bus driver and plaintiff, for the bus driver to have warned plaintiff and for plaintiff to have reacted, applied his brakes and stopped short of the path of the bus. Plaintiff would have had a margin of at least 10 feet in distance and more than 2 seconds in time, after allowing double reaction time, within which to stop after reaching a position of imminent peril. Intervals of approximately 2 seconds have been held sufficient time for the reaction of drivers and for the taking of effective action in avoidance in similar humanitarian failure to warn cases. McDonough v. St. Louis Public Service Co., supra; Sperry v. Tracy Dodge-Plymouth Co., Mo.Sup., 344 S.W.2d 108, 112; Wofford v. St. Louis Public Service Co., supra, 252 S.W.2d, l. c. 531. From the bus driver's admission that plaintiff's automobile was stopped 5–10 feet north of the north curb line of Lindell; that he actually saw plaintiff's automobile start up, and that as soon as he saw the automobile start up he applied the brakes on the bus, it seems apparent that the driver of the bus could have discovered plaintiff's imminent peril at or before the time the plaintiff had reached the halfway point in his forward progress. It is true that the bus driver placed his bus "better than halfway across the intersection" at the time he saw the plaintiff's automobile start forward, but the jury could reject the bus driver's testimony as to the position of the bus, while accepting his testimony that he saw plaintiff at the time plaintiff's automobile started forward, McDonough v. St. Louis Public Service Co., supra, and find from other testimony that the bus was something more than 92 feet east of the point of impact at the time the bus driver saw plaintiff's Ford start its run. Accordingly, the jury reasonably could have found that plaintiff came into a position of imminent peril, oblivious to danger from the approach of the bus at or before plaintiff's automobile had proceeded 10 feet from its stopped position; that plaintiff's position of imminent peril and obliviousness was reasonably apparent to the bus driver; that thereafter the bus driver had available 2 seconds or more in time within which to take action in avoidance; that he issued no warning, and that if a warning had been issued there would have been time for plaintiff to react, activate the brakes and save himself from harm. Plaintiff made a submissible case of failure to warn under the humanitarian doctrine.

*Of failure to slacken:* From the foregoing evidence the jury reasonably could have found that at the time plaintiff started forward the bus was more than 92 feet east of the point of impact; that there would have been time, and that at any of the speeds testified to (15, 20, 25 m. p. h.) there would have been more than ample distance, available to the bus driver within which to slacken his speed and avoid a collision after plaintiff reached a position of discoverable imminent peril. With the ability to stop within approximately 40 feet at 15 m. p. h.; at approximately 50 feet at 20 m. p. h.; and allowing ¾ second, Vietmeier v. Voss, Mo.Sup., 246 S.W.2d 785, for reaction time, the jury reasonably could have found that the bus driver had sufficient time and space, under the humanitarian doctrine, within which to have stopped short of the point of collision after plaintiff came into a position of imminent peril. If the bus could have been stopped within that distance its speed could have been slackened in a lesser space, Smithers v. Barker, 341 Mo. 1017, 111 S.W.2d 47; Steger v. Meehan, Mo.Sup., 63 S.W.2d 109; Hamell v. St. Louis Public Service Co., supra, 268 S.W.2d, l. c. 65, and consequently plaintiff made a submissible case of failure to slacken under the humanitarian doctrine.

Defendant contends that there was no error in refusing Instruction No. A

submitting humanitarian failure to warn or swerve because it was not properly drafted. Defendant argues that it was not supported by the evidence because it submitted a situation with the bus approaching from the "west," where the word "east" should have been used; that it used the word "eminent" where the word "imminent" should have been used; that it improperly assumed that plaintiff was injured; that it was separated into paragraphs, thereby singling out and unduly emphasizing the issues, and that the instruction, read as a whole, is confusing, misleading and unintelligible. We think the misuse of the word "west" was a mistake "so evidently clerical as to permit no possibility of error on the part of the ordinary reader," Trustees of Christian University v. Hoffman, 95 Mo.App. 488, 497, 69 S.W. 474, 476. As stated in respondent's brief "All the evidence clearly showed that the motorbus was approaching from the *east*," and in view of the unanimity of the witnesses on both sides with reference to the direction from which the bus was approaching, this clerical error could not possibly have misled the jury. Nor did the use of the word "eminent," instead of "imminent," justify the refusal of the instruction. The obvious misspelling of the word was an insubstantial and trivial imperfection. Absolute perfection in form is not the test. The test is whether the instruction is *substantially correct*. While a court will not be convicted of reversible error for refusal to give an instruction "unless the instruction is substantially correct," Schipper v. Brashear Truck Co., Mo.Sup., 132 S.W.2d 993, 125 A.L.R. 674; Hertz v. McDowell, 358 Mo. 383, 214 S.W.2d 546; McCarthy v. Sheridan, 336 Mo. 1201, 83 S.W.2d 907, 911; Hogan v. Kansas City Public Service Co., 322 Mo. 1103, 19 S.W.2d 707, 65 A.L.R. 129, the inescapable corollary is that a court will be convicted of reversible error in refusing an instruction called for under the evidence where the instruction offered is substantially correct in form and substance. While Instruction No. A may not have been "technically perfect" in that it contained a patent typographical error and a word obviously misspelled, it was substantially correct in form and substance and for this Court to justify its refusal for such slight and inconsequential deviations would be to set the standard above that required in the practical administration of justice. The submission of the question whether by taking certain preventive action the bus driver could have avoided "striking and injuring" plaintiff does not assume that plaintiff was injured, as contended. On the contrary, the challenged paragraph, prefaced by the words "If you further find * * *," properly submitted the requirement of a finding of the possibility of the avoidance of collision and injury. No reason is shown why the separation of the instruction into paragraphs resulted in any prejudice to the defendant's rights. Nor do we find the instruction, read as a whole, confusing, misleading or unintelligible, as charged.

The judgment is reversed and the cause is remanded for a new trial.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the Court. En Banc.

All of the Judges concur.