**Margery HENRICKSON, Plaintiff-Appellant,**

**v.**

**Ronald Lee RESNIK, Defendant-Respondent.**

No. 8382.

Springfield Court of Appeals.

Missouri.

May 5, 1965.

H. K. Wangelin, Wangelin and Friedewald, Ralph R. Bloodworth, Bloodworth & Bloodworth, Poplar Bluff, for plaintiff-appellant.

Samuel Richeson, Dearing, Richeson, Weier & Roberts, Hillsboro, Joe C. Welborn, Briney & Welborn, Bloomfield, for defendant-respondent.

HOGAN, Judge.

This case arose out of a collision between automobiles driven by the plaintiff and defendant at the intersection of Ninth and Maude Streets in Poplar Bluff, Missouri. Plaintiff's husband, Dr. H. M. Henrickson, who was riding with her as a passenger, was killed, and the plaintiff and defendant both sustained certain personal injuries.

Plaintiff charged the defendant with numerous acts of primary negligence, but submitted both her claim for the wrongful death of her husband and her own claim for personal injuries in a single instruction predicated upon the defendant's humanitarian negligence in failing to slacken the speed of his vehicle and swerve to the right. The defendant, who filed an affirmative counterclaim, submitted his case upon the plaintiff's primary negligence in entering the intersection when the defendant was approaching so closely as to constitute an immediate hazard of collision, and upon plaintiff's humanitarian negligence in failing to stop. The jury found against the plaintiff both on her claim for wrongful death and for personal injuries, and found affirmatively for the defendant upon his counterclaim, assessing his damages in the sum of $5,000.00. The plaintiff has appealed.

In order to deal appropriately with the parties' contentions, it is necessary to state the evidence introduced tending to support the conflicting factual versions of the manner in which the collision was brought about.

Ninth Street runs north and south, and Maude Street runs east and west. Both are paved, concrete streets, and they intersect approximately at right angles. At the west entrance to the intersection, Maude Street runs slightly upgrade and is 26 feet 3 inches wide from curb to curb; it is slightly wider at the east entrance. There is a stop sign on Maude for eastbound traffic 2 feet 1 inch west of the southwest corner of the intersection. On the northwest corner of the intersection, there is a brick building, then known as Piggie Hogg's Market, the south property line of which is 7 feet 2 inches north of the north curb line of Maude. On the west side of Ninth Street, north of the intersection, there is a parking lane or strip some five feet wide along the west curb "in front of" Piggie Hogg's, so that Ninth Street is 26 feet 8 inches from curb to curb on the north side of the intersection but only 21 feet 3 inches from curb to curb at the south entrance. There was no stop sign for traffic southbound on Ninth.

As the plaintiff related the accident, she was driving east on Maude, about 4:25 P.M. on Saturday, January 5, 1963, taking her husband to his work at the Poplar Bluff Hospital. Plaintiff was driving and her husband, a physician, was seated in front with her. As she came to the intersection, Mrs. Henrickson stopped about two feet west of the stop sign, and looked first to her right, and then to her left. At the time, there was a car parked along the west curb of Ninth Street, and Mrs. Henrickson's view to the left (north) was obstructed by the parked vehicle, and to some degree by

the building, but she estimated that she could then see 40 to 50 feet to her left. Plaintiff then "eased in" to look further, and again made an observation of traffic when the front end of her automobile was clear of the parked automobile and some two feet out into the intersection. At the time she made her second observation, plaintiff estimated that she could see 100 to 125 feet in either direction, north or south, and estimated her forward speed to be two to four miles an hour.

Perceiving no oncoming traffic in either direction, plaintiff then proceeded into the intersection, increasing her speed to five or six miles an hour. As she reached a point where the front end of her vehicle, a four-door 1962 Cadillac, was about four feet east of the east curb line of Ninth Street, her automobile was struck behind the left front door by the defendant's vehicle and pushed south against a telephone pole. Dr. Henrickson was thrown from the vehicle and was killed, and the plaintiff sustained personal injuries.

The plaintiff also had the testimony of two eyewitnesses, the first a Mr. Everett Mitchell, who had been standing nearby when the accident occurred, and a Mr. O. C. Cutsinger, who had seen the casualty from a sunroom in his house on the south- west side of the intersection. Mr. Mitchell had been standing on the east side of Ninth Street preparing to enter the market, and when he had started west across Ninth Street he saw the defendant's southbound vehicle, which "honked [its] horn at me." Mr. Mitchell stopped and observed the plain- tiff's automobile "easing out" into the inter- section, "and the Cadillac [plaintiff's vehi- cle] pulled out in front of him [defendant], and it hit it, hit the Cadillac in the side." By means of reference points on a photo- graphic exhibit showing the intersection from the north on Ninth Street, Mr. Mitch- ell estimated that the defendant's vehicle was 91 feet north of the intersection when the plaintiff's vehicle started up. This wit- ness estimated that the front end of the plaintiff's vehicle was about even with the east curb line of Ninth Street when the col- lision occurred. It was his recollection that there were "two or three cars" parked along the west curb of Ninth Street at the en- trance to the market.

Mr. Cutsinger, who was sitting in his sunroom at the time the accident occurred, testified that he had first seen the plaintiff stop at the stop sign and then had seen her look both to the south and to the north on Ninth. Mr. Cutsinger had seen the plain- tiff proceed into the intersection and then had seen the defendant's automobile pro- ceeding south on Ninth Street. At the time when the front end of the Cadillac was "about the center of the intersection," the defendant's vehicle had been 83 feet north of the intersection; and as the front end of the Cadillac came to a point some two to four feet east of the east curb line of Ninth Street, the defendant's vehicle struck the plaintiff's "about the back door of her car." It was Mr. Cutsinger's testimony that the defendant's vehicle was being driven on the east or left side of Ninth Street, and that he had not slackened his speed at any time before the collision. As Mr. Cutsinger recalled, there had been one automobile parked along the west curb line of Ninth Street, probably four or five feet north of the north curb line of Maude.

The defendant, Ronald Resnik, was 17 years old at trial time, and was represented by his father as guardian ad litem. On the occasion in question, he testified, he and a group of his companions were "just riding around" in his father's automobile. As he approached the intersection in question, he was driving at a "slow rate of speed," which meant "22, 25 miles an hour." The defend- ant did not see the Henrickson vehicle un- til it was "out in front of me," at which time, according to his "best estimate," he was 10 to 15 feet from the nearest edge of Maude Street. He had no time to sound his horn, nor to apply his brakes. Though there is no center line marked on Ninth Street, the defendant estimated he was driving "as close as I could to the right,"

but because of the automobiles parked along the west curb ("in front of" Piggie Hogg's) he was driving with the left part of his vehicle about one foot east of the center of the street. The defendant "knew of two" automobiles which were parked on his right. According to Mr. Resnik, the Henrickson automobile was "in the center of the intersection" when the collision occurred. He believed that he had seen the Henrickson vehicle when it first became visible—that he had "seen it when it first come through."

Defendant also had the testimony of three of his companions, who had been occupants of his vehicle when the casualty occurred. Robert Christian, the first of these witnesses, was seated in the right front of defendant's vehicle. He estimated the defendant's speed immediately prior to the accident at "around 25." He had seen the Henrickson vehicle when "it was just beginning to pull out," and it was then "15, 20, 25 feet, something like that," away. Mr. Christian explained that there were "two or three cars * * * just right on the corner," and consequently "you couldn't see it [the Henrickson car] real good." He believed that the "middle" of the Henrickson vehicle had been "in the center of Ninth Street" when the two cars collided.

Joe Hefner, Jr., another of defendant's witnesses, had been riding in the left rear of defendant's automobile. "If [he] remember[ed] right," there were three cars parked along the west curb of Ninth Street, and the "closest one" was "right on the curb" of Maude Street, so that a vehicle approaching on Maude Street could not be seen. When the Henrickson vehicle "pull[ed] out from behind the parked car," the witness had seen it "about two car lengths" away; and, while the witness didn't know for sure, he "would say" the plaintiff was going three to five miles an hour.

Robert Eaton, also a passenger in the defendant's vehicle, estimated defendant's forward speed at "I'd say 20, 25 miles an hour."

Mr. Eaton had had his attention diverted by glancing at Mr. Mitchell (the pedestrian), and "at the instant [he] turned back around * * * [he] saw the car [Mrs. Henrickson's car] pull out in front." When he saw Mrs. Henrickson, her vehicle was "a couple of feet" out in the intersection, going into the middle of the street, and at that time Mr. Resnik was "not more than a car length" north of the intersection. It was this witness' memory that plaintiff's vehicle, or the front part of it, was near the east curb of Ninth when the collision occurred. He only recalled seeing one car parked along the west curb of Ninth, "fairly close" to the north curb line of Maude.

 The plaintiff first urges that the defendant made no submissible case on his counterclaim, either upon primary negligence or under his humanitarian doctrine. Of course, if the defendant made a submissible case under either theory, there was no error in refusing the plaintiff's motion for directed verdict and her motion for judgment after verdict. Nelson v. Wabash Railroad Co., Mo., 300 S.W.2d 407, 409 [1]; DeLay v. Ward, 364 Mo. 431, 435, 262 S.W.2d 628, 630 [2]; Ellmaker v. Goodyear Tire & Rubber Co., Mo.App., 372 S.W.2d 650, 659 [6]. The specific point which plaintiff presents with respect to defendant's primary submission is that defendant's own evidence shows him to have been guilty of contributory negligence as a matter of law, and it is to this point that we have directed our attention primarily. We have, however, set forth the evidence in some detail, principally to show that in many respects the parties' factual versions of the accident cannot be reconciled, and to demonstrate that in large part the witnesses' reconstruction of the casualty was based on estimates and "best judgments," testified to more than a year after the accident occurred.

 It goes without saying that in this case it is possible to argue many conflicting inferences from the evidence, but it must be borne in mind that in general,

when the two opposing versions of an intersectional collision are contradictory, the issues of negligence and contributory negligence are simply for a jury's resolution. Moore v. Southwestern Bell Telephone Co., Mo., 301 S.W.2d 817, 819 [1]; Jungeblut v. Maris, 351 Mo. 301, 304, 172 S.W.2d 861, 862 [1–3]. Our review of the evidence convinces us that, while the fact issues might easily have been otherwise resolved, the defendant made a case on primary negligence. It was the defendant's trial theory, so far as his primary submission was concerned, that the plaintiff failed to observe the defendant approaching on Ninth and that she proceeded into the intersection when the defendant was approaching so closely as to constitute an immediate hazard of collision. Upon the record presented, we believe his approach was sound. The only evidence in the record concerning the plaintiff's view of traffic on Ninth Street, both as she stopped at the stop sign and as she made her second observation before entering the intersection, came from the plaintiff herself, who testified that she could see 40 to 50 feet in either direction when she stopped first, and that when she made her second observation she could see "a hundred or a hundred and twenty-five foot up the street." Her speed, according to her estimate, was then two to four miles per hour and, as the defendant points out, she could then have stopped almost instantly. Wegener v. St. Louis County Transit Co., Mo., 357 S.W.2d 943, 947 [2]; Johnson v. Kansas City Pub. Serv. Co., 358 Mo. 253, 260, 214 S.W.2d 5, 10 [7–12]. While the plaintiff makes some argument on this point, we believe her duty was governed by the provisions of Section 304.021, subpar. 4, V.A.M.S., requiring her to "yield the right of way to other vehicles * * * which are approaching so closely * * * as to constitute an immediate hazard," rather than the provisions of subpar. 1 of the same section, since there admittedly was a stop sign for Mrs. Henrickson, but none for the defendant. Creech v. Blackwell, Mo., 298 S.W.2d 394, 399–400 [3]; James v. Berry,

Mo.App., 301 S.W.2d 530, 532 [2, 3]. What is more, we think her duty to stop or otherwise yield continued into the intersection if it reasonably should have appeared that defendant's approach had created an immediate hazard of collision. Schaetty v. Kimberlin, Mo., 374 S.W.2d 70, 73; Herr v. Ruprecht, Mo., 331 S.W.2d 642, 648 [5, 6]. Regardless of the defendant's precise distance north of the intersection when plaintiff began to cross, we believe the evidence supports an inference that he was approaching closely and was indeed almost into the intersection when plaintiff undertook to proceed. Further, we consider it a reasonable conclusion that during the course of two observations of oncoming traffic the plaintiff *should* have seen the defendant if she had made a proper observation of southbound traffic and had exercised due diligence in estimating the defendant's rate of approach. We think a jury might also have inferred that the defendant's "honk" at Mr. Mitchell should also have served the plaintiff as a warning of the defendant's approach. We conclude that a submissible case was made on defendant's primary theory.

■ Turning to plaintiff's specific point —that defendant guilty of contributory negligence as a matter of law—we bear in mind that this may not be said unless the evidence most favorable to the defendant's submission, together with the inferences permissible therefrom, allow for no other reasonable conclusion. Pender v. Foeste, Mo., 329 S.W.2d 656, 659 [2, 3]; Kickham v. Carter, Mo., 314 S.W.2d 902, 908–909 [8] [9]. Otherwise, the defendant's contributory negligence was a jury question.

■ The plaintiff, both in her brief and in her argument, has laid great stress upon certain parts of the testimony dealing with the relative speeds and positions of the two vehicles immediately before and after the collision, and much emphasis is laid upon precise calculations based on such evidence. Granting that such arguments may be appropriate where a case is triable

only under the humanitarian doctrine, and may indeed have some analogy here, we think this appeal cannot realistically be decided upon conclusions reached by the application of mathematical formulae to the evidence. See Herr v. Ruprecht, supra, 331 S.W.2d at 648–649 [7]. The record makes it abundantly clear that both parties reconstructed the accident by means of evidence which consisted in large part of approximations, estimates and "best judgments," and that both the parties and the witnesses were attempting to recall in meticulous detail a transaction which happened, so to speak, in the space of a few seconds. It is true, as plaintiff argues, that defendant testified he was only 10 to 15 feet away from Mrs. Henrickson when he saw her, but his very words were "my best estimate is 10 to 15 feet," and the defendant was not bound by such an approximation, McDonough v. St. Louis Pub. Serv. Co., Mo., 350 S.W.2d 739, 744–745 [3]; Lay v. McGrane, Mo., 331 S.W.2d 592, 596–597 [3–5]; Duffendack v. St. Louis Pub. Serv. Co., Mo.App., 365 S.W. 2d 52, 53 [1–3], nor can calulations based on such estimates or approximations convict the defendant of contributory negligence as a matter of law. Zumault v. Wabash Railroad Co., Mo., 302 S.W.2d 861, 864–865 [6]; Smith v. Siercks, Mo., 277 S.W.2d 521, 525 [3]; State ex rel. Thompson v. Shain, 351 Mo. 530, 534–538, 173 S.W.2d 406, 407–409 [2]. It is also true that failure to see what is plainly visible may constitute negligence as a matter of law, James v. Berry, supra, 301 S.W.2d at 533–534 [6], but in this case there was evirence indicating that defendant's view of plaintiff's emerging vehicle was partially obscured, and that there was a pedestrian and a line of parked vehicles near the intersection to occupy part of the defendant's attention. In these circumstances, the defendant was not obliged to keep a lookout in all directions at once, Slaughter v. Myers, Mo., 335 S.W.2d 50, 54 [6]; Schmittzehe v. City of Cape Girardeau, Mo., 327 S.W.2d 918, 923 [4, 5], nor, in the absence of positive evidence that in the exercise of the highest degree of care Resnik should have seen Mrs. Henrickson sooner than he did, should he be charged with contributory negligence as a matter of law in failing to apprehend her approach. Kickham v. Carter, supra, 314 S.W.2d at 909 [9]; Levin v. Caldwell, Mo., 285 S.W.2d 655, 659 [3]. What constitutes negligence in failing to keep a lookout in a particular direction at a particular time or place, and whether a driver who has looked has seen all that he should, is usually a fact question, Slaughter v. Myers, supra, 335 S.W.2d at 54 [6]; 61 C.J.S. Motor Vehicles, § 526, pp. 437–438, and we have the view in this case that the evidence simply presented a question for the jury on the issue of defendant's contributory negligence.

◼ Plaintiff attacks defendant's Instruction D–5, his humanitarian submission, on the ground that it permits the jury to consider Mrs. Henrickson's actions before the defendant's position of imminent peril arose, and thus fails to negative antecedent negligence. As authority, the plaintiff cites the case of Wood v. Ezell, Mo.App., 342 S.W.2d 503, 509–510 [10, 11]. It is true that the Wood case, and a number of other decisions, e. g., Stith v. St. Louis Pub. Serv. Co., 363 Mo. 442, 453, 251 S.W.2d 693, 699–700 [12], 34 A.L.R.2d 972, and White v. Kansas City Pub. Serv. Co., 347 Mo. 895, 899, 149 S.W.2d 375, 377–378 [4–6], point out that a humanitarian instruction must be formulated so as to exclude consideration of antecedent primary negligence or contributory negligence; the hypothesis of the acts of humanitarian negligence charged must be so formulated as to limit the jury's consideration to the acts of negligence occurring after the situation of imminent peril arose. However, we consider the plaintiff's criticism to be hypertechnical in this case. That part of defendant's Instruction D–5 which is material here read as follows:

"* * * and that Ronnie Resnik before the collision became and was in a position of imminent peril of being

injured by a collision between the two automobiles, and that Mrs. Henrickson saw or by the exercise of the highest degree of care could have seen Ronnie Resnik in such position of imminent peril in time thereafter by the exercise of the highest degree of care and with safety to herself, her passenger and her car to have avoided the collision by stopping her automobile *but failed to do so, and was thereby negligent,* if you so find, and that as a direct result of such negligence, if any, Ronnie Resnik was injured, then you will find the issues in favor of the defendant on defendant's counterclaim; and this is true even though you may find Ronnie Resnik was negligent in getting into such position of imminent peril."

■ This instruction does not, in our view, permit consideration of any antecedent negligence on Mrs. Henrickson's part. By hypothesizing the plaintiff's ability to avoid the collision by stopping, and then requiring a finding that she failed to do so, the defendant has sufficiently limited the jury's consideration of humanitarian negligence to the act charged after the situation of imminent peril arose, and the hypothesis of negligence is clearly "related back" to the postulate of a humanitarian situation. Wood v. Ezell, supra, 342 S.W.2d at 509; White v. Kansas City Pub. Serv. Co., Mo. App., 140 S.W.2d 711, 713. The instruction is not erroneous, at least in the respects briefed and argued by the appellant.

■ The plaintiff also maintains that defendant's Instruction D–1 is erroneous, because it states an abstract proposition of law and conflicts with plaintiff's Instruction P–1. Defendant's Instruction D–1 submitted his counterclaim on primary negligence, and was as follows:

"The Court instructs the jury that if you believe and find from the evidence that on the occasion in question, Ronald Resnik was operating his automobile Southwardly over and along Ninth Street at and near its intersection with Maude Street, and that the plaintiff Mrs. Henrickson was operating her automobile Eastwardly along *Muade* Street at and near said intersection, and that the *plaintiff* Ronald Resnik was at all times in the exercise of the highest degree of care and was not negligent as submitted to you in other instructions, and that there was at said time and place a stopsign erected for traffic entering Ninth Street from Maude Street and there was no stopsign erected for traffic entering Maude Street from Ninth Street, and that regardless of whether or not Mrs. Henrickson stopped her automobile before entering Ninth Street, if you find that she drove into the intersection and into the path of and into collision with the automobile operated by Ronald Resnik, and that when Mrs. Henrickson entered the intersection Ronald Resnik was approaching so closely as to constitute an immediate hazard of collision, and if you find that Mrs. Henrickson was thereby negligent and that such negligence directly caused the collision and injuries to Ronald Resnik, then you will find the issues in favor of Ronald Resnik and against Mrs. Henrickson on the defendant's counterclaim."

The appellant's specific complaints are that the instruction should have defined the term "immediate hazard," and that the instruction, as given, conflicts with her Instruction P–1 (a humanitarian submission), because it does not differentiate the term "immediate hazard" from the phrase "position of imminent peril."

Again we believe the plaintiff's criticisms are hypertechnical. In the first place, Instruction D–1 is formulated so as to exclude positively the jury's consideration of humanitarian negligence, for the defendant has hypothesized and required the jury to find that the defendant "was at all times in the exercise of the highest degree of care *and was not negligent as submitted to*

*you in other instructions * * *."* This at least prevented, according to current authority, the jury's confusion of the humanitarian submissions and the defendant's primary submission. Dixon v. Edelen, Mo., 300 S.W.2d 469, 473–474 [6]. Nor can we agree that the requirement "that when Mrs. Henrickson entered the intersection [defendant] was approaching so closely as to constitute an immediate hazard of collision" is abstract in its nature. The term "immediate hazard of collision" is not a technical term, Lafferty v. Wattle, Mo.App., 349 S.W.2d 519, 529, and the instruction is not subject to criticism because that phrase was used without further definition. Upon the record presented, we find nothing reversibly erroneous in Instruction D–1.

For the reasons indicated, the judgment is affirmed.

RUARK, P. J., and STONE, J., concur.