Richard C. JEFFERIES, Plaintiff-Respondent,

v.

Harvey SAALBERG, Defendant-Appellant.

No. 25106.

Kansas City Court of Appeals.

Missouri.

Dec. 1, 1969.

Terence C. Porter, Columbia, for appellant, Welliver, Porter & Cleaveland, Columbia, of counsel.

Carl F. Sapp, Columbia, for respondent, Sapp, Woods, Dannov & Orr, Columbia, of counsel.

CROSS, Judge.

While riding as a passenger in an automobile owned and driven by one Robert Lee Reese, plaintiff received injuries when that vehicle collided at a street intersection with an automobile driven by defendant Harvey Saalberg. To recover his damages, plaintiff originally sued both drivers as defendants. Prior to trial Reese "settled" with plaintiff and was dismissed from the action as a defendant.

Upon trial the cause was submitted to a jury on the theory that defendant (Saalberg) either (1) failed to keep a proper lookout, or (2) failed to stop his automobile when he knew or by the use of the

highest degree of care could have known that there was a reasonable likelihood of collision in time thereafter to have stopped. The jury returned a verdict for $3,000.00 in plaintiff's favor. Defendant appeals.

It is here contended by defendant that the trial court should have set the verdict aside and entered judgment in his favor on the ground that there was no evidence from which the jury could properly find that he could have avoided the collision "by maintaining a lookout or stopping his vehicle." In determining that question, we must assume the truth of every fact and circumstance in plaintiff's favor shown in evidence, whether by plaintiff or defendant, and give plaintiff the benefit of all reasonable inferences which may fairly be drawn therefrom. All evidence and inferences unfavorable to plaintiff will be disregarded. Under the foregoing limitations, we set out applicable portions of the evidence.

The collision occurred at the intersection of Providence Road and Stewart Road in Columbia, Missouri, on November 19, 1966, in the nighttime at approximately 11:30 P. M. The weather was clear and conditions of visibility were good. Providence Road runs north and south and has four lanes— two for northbound travel and two for southbound. It is a well-lighted thoroughfare. Stewart Road runs east and west and has only one lane for travel in each direction. Each lane is twelve feet wide. The speed limit for Providence Road is 30 m. p. h. The intersection is controlled by "stop and go" traffic signal lights, flashing red, green and yellow in sequence. The Reese car in which plaintiff was a passenger was traveling northward on Providence Road toward the intersection and the Saalberg car was traveling westward on Stewart Road.

Police officer James Garrison testified that he was called to investigate the accident. He found most of the debris at a point in the intersection "in the center almost of the two northbound lanes." He observed skidmarks from the Reese car extending from their point of origin approximately sixty feet northward to the point of impact, and extending northwest beyond that point for an additional sixty to seventy feet, indicating that "it skidded sixty feet to where it hit the Saalberg car, and then sixty to seventy feet on to where it came to rest." The Reese car finally stopped at the northwest corner of the intersection. The Saalberg car was knocked "sideways" and to the north and came to rest in the outside northbound lane of Providence Road about ninety feet beyond the point of impact. The Saalberg car was damaged on the left side toward the front and the Reese car was damaged in the area of the right front fender. The officer testified that a person "setting on Stewart Road going west" can see to the south on Providence for a distance of approximately three hundred to four hundred yards. He "located" only one witness at the scene of the accident, namely, James Askew, Jr.

Plaintiff testified that just prior to the collision the Reese car in which he was riding was traveling northbound in the inner lane toward the intersection at 40 to 45 m. p. h. When the vehicle was from one hundred fifty to one hundred seventy-five feet south of the intersection the signal light turned from green to yellow. Reese then accelerated "trying to make the yellow light." At a point ninety feet south of the intersection Reese applied his brakes. Plaintiff stated that "at that time I saw the station wagon which I thought was moving on the hill. It didn't look like it was going to be any trouble to me. * * When we got close to the intersection we saw the station wagon dart out." Plaintiff did not know whether defendant's automobile "stopped at the edge of the intersection or whether it didn't." At that time and at a point ninety feet south of the intersection Reese applied his brakes and swerved to the left. Although it was plaintiff's testimony that the Reese vehicle approached and entered the intersection traveling in the inner northbound lane there is

other evidence convincingly indicating that Reese was then traveling in the outside lane.

James Askew, Jr. was called as a defendant's witness. He stated that he was present and saw the collision when it happened. Just prior to that occurrence Askew had been driving his automobile northward on Providence Road, approaching the intersection involved. When he was approximately sixty feet south of the intersection he saw the light was yellow, "assumed it was going to change to red", applied his brakes and came to a stop approximately three to five feet from the south boundary of the intersection. He had been traveling in and came to his stop in the second lane from the right, same being the inside lane next to the center line. The witness testified as follows: "I had stopped * * * had come to a stop. Approximately one or two seconds later, I saw a car come by me on the right and it swerved and ran into the side of Mr. Saalberg's car that was headed west on Stewart Road, approximately the left front door, or maybe a little ahead of the left front door." The point of impact was almost directly in front of Askew's standing vehicle. Askew had not previously observed the Saalberg vehicle and did not see it enter the intersection. He confirmed that since his car occupied the inner lane of Providence Road it could not have obstructed Saalberg's view of the Reese car as it passed the Askew car on the right traveling in the right hand or outer lane.

Defendant Saalberg testified to the following effect: Just before the collision he had been driving westward along Stewart Road at a speed of "maybe 20–25 miles an hour". When he arrived at the intersection with Providence Road the light facing him was red. He came to a complete stop, at a point on Stewart Road about twenty feet east of the intersection line and remained there for approximately five seconds, waiting for the light to change to green. While so waiting defendant observed that the Askew car had "pulled in from the south" on Providence Road and had stopped "near the intersection". When the light for westbound travel changed to green, defendant "proceeded forward" into the intersection, without looking either to the right or to the left, and was "hit immediately" by the Reese automobile. He testified: "I saw the Askew car sitting there and when the light changed, then I moved forward without again looking left or right, yes, Sir. * * * I never did see the car that hit me. * * * I presume if I had looked to the left, I might have seen him (Reese). I'm not sure that I could have looked that quickly because he came at a terrific speed." In response to the question, "Actually you should have seen him come on down the road", defendant answered, "If I had looked that way, but I didn't." He agreed that in order to have seen the Reese car approaching all he had to do was twist his head "a little to the left". Defendant acknowledged that Providence Road was well-lighted and that when he was twenty feet east of the intersection he could see to the south "maybe three to five hundred feet."

Plaintiff's case was submitted to the jury by a verdict directing instruction reading as follows:

### "INSTRUCTION NO. 4

Your verdict must be for the plaintiff and against the defendant Harvey Saalberg if you believe:

First, defendant either:

> failed to keep a proper lookout, or defendant knew or by the use of the highest degree of care could have known that there was a reasonable likelihood of collision in time thereafter to have stopped but defendant failed to do so, and

Second, defendant's conduct in any one or more of the

> respects submitted in Paragraph First was negligent, and

Third, as a direct result of such negligence plaintiff

> sustained damage for which he has not been fully compensated by Robert Lee Reese."

M.A.I. 17.02 Modified and 17.04."

Substantive principles of law on which plaintiff's case are founded are here noted. A motorist operating his vehicle on the public highways is under the continuous duty to exercise the highest degree of care at all times and to keep a careful and vigilant lookout for other persons and vehicles on the highway. Section 304.010 RSMo 1959 as amended, V.A.M.S. and authorities in following Notes of Decisions Nos. 73, 74 and 75. In Miller v. St. Louis Public Service Company, Mo.Sup., 389 S.W.2d 769, the court said: "The object and purpose of the strict requirement that persons operating motor vehicles keep a proper lookout upon public streets and highways is that they may acquire knowledge of the presence of other persons and objects on such streets and highways, and an awareness of dangerous situations and conditions. It is only because of that knowledge and awareness that the operators of motor vehicles may take appropriate precautionary measures to avoid injury to themselves and other persons within an existing area of peril." The above defined duty is incumbent upon a motorist entering an intersection and *he is not relieved of it by reason of a traffic light in his favor.* In Witt v. Peterson, Mo.Sup., 310 S.W.2d 857, the Supreme Court said:

> "It is the duty of a motorist entering an intersection to exercise the highest degree of care to maintain a careful and vigilant lookout ahead and laterally, and to see what a person in the exercise of the highest degree of care for the safety of himself and others would be expected to see under similar circumstances. For where one is charged with the duty to look, and to look is to see, he must be held to have seen what looking would reveal. Lilly v. Boswell, 362 Mo. 444, 242

S.W.2d 73; Weis v. Melvin, Mo.Sup., 219 S.W.2d 310. A green light does not relieve of this duty, nor does it confer an absolute right to proceed across the intersection regardless of the movement of other traffic. The motorist is not entitled to rely solely on the favorable signal; nor is he entitled to drive blindly into the intersection without looking. The duty of care to be exercised remains commensurate with the circumstances, one of which, of course, is the green light in his favor. (citing authorities) Thus, plaintiff owed a duty to exercise the highest degree of care as he started forward with the green light and drove his car into the intersection, and this included the duty to maintain a lookout both laterally and ahead for whatever could be seen under the circumstances."

Also see: Gerdel v. Broccard, Mo.Sup., 428 S.W.2d 492; Dial v. Seven-Up Bottling Co., Mo.Sup., 373 S.W.2d 53, 56.

The requirement that a motorist keep a careful and vigilant lookout has been applied specially to situations in which he may be confronted by an "apparent" danger of collision. The rule prevails in this state that it is the duty of a motorist to stop, swerve, slacken speed or sound a warning when he knows, or by the exercise of the highest degree of care, could have knowledge that there is reasonable likelihood of collision, in sufficient time to take such preventive measures. In Greenwood v. Bridgeways, Inc., Mo.App., 243 S.W.2d 111, 114, the court said (quoting from Stakelback v. Neff, Mo.App., 13 S.W.2d 575): "Even though it is true that this instruction counts upon primary negligence, and not the humanitarian doctrine, there was nevertheless no duty upon defendant to take any of the precautions hypothesized therein, unless there was *apparent danger of a collision* * * *. It cannot be said that the law imposes the duty upon the driver of an automobile, upon approaching and entering an intersecting street, to stop, decrease the speed of, or change the course of, his car, merely because he sees another

automobile in the street ahead of him. To the contrary, such duty to act would clearly not arise, *unless the exercise of due care upon the part of the driver would lead him to believe that otherwise a collision would occur."* (Emphasis supplied.) By promulgating MAI 17.04, the Supreme Court has accepted these decisions as prevailing law.

■■■ Defendant does not claim that substantive law applicable to this case is otherwise than above stated and he freely admits he failed to keep a lookout before entering the intersection. As hereinabove noted he contends for reversal on the ground that plaintiff failed to make a submissible case. It is his position that there are no facts in evidence to show that by keeping a lookout he could have known there was a reasonable likelihood of collision in time to have avoided it by stopping his automobile, and that the jury could have arrived at those conclusions only by resorting to speculation and conjecture.

It is necessarily conceded, as defendant suggests, that proof of negligence in the respects charged against him cannot rest upon guesswork, speculation or conjecture. Nor is the mere fact that the collision occurred sufficient to establish such negligence. "However, the fact a collision occurred and the manner of its happening are evidentiary facts which must be taken into consideration in determining * * * whether the defendant knew or should have known of such danger." Herr v. Ruprecht, Mo.Sup., 331 S.W.2d 642.

The specific evidentiary void claimed is the absence of evidence to show the speed of defendant's vehicle, the location of the Reese vehicle when defendant entered the intersection, the stopping distances of the two vehicles, and the relative speeds of and distance between the two vehicles "at any given time." Although stopping distances are not shown, it is our view that there was sufficient evidence before the jury from which they could reasonably believe that if defendant had observed his duty to look in the direction of the oncoming

Reese vehicle before, or as he was entering the intersection, he would have seen it and realized that a collision was imminent unless he took measures to avoid it, and that he could have prevented the collision either by remaining at a stop until the Reese vehicle had cleared his path, or by again stopping his vehicle in the initial stages of its velocity after he started up to enter the intersection.

Defendant insists that he is not to be convicted of negligence in failing to realize, when he drove into the path of the oncoming Reese vehicle, that there was a "reasonable likelihood of collision", unless the apparency of such danger is demonstrated by exact mathematical computation, based upon precise figures of time, space and distance—all is required in a humanitarian case. Defendant's argument is mainly devoted to calculations based upon hypothetically assumed rates of speed of his vehicle as it traveled into the intersection,—ranging from a maximum of ten miles per hour to average speeds of five and three miles per hour. On the basis of those hypotheses defendant undertakes to establish that the Reese car, traveling at forty miles per hour had not reached the point where its driver was unable to stop short of collision and that consequently there was lacking the requisite showing of "imminent peril" as it is understood in humanitarian doctrine submissions. Attempting to invoke that branch of the law in this case, defendant relies upon Frandeka v. St. Louis Public Service Co., 361 Mo. 245, 234 S.W.2d 540, a humanitarian case.

We do not believe that the same exacting standards of proof apply in this primary negligence case, as were held necessary in Frandeka and other like cases decided "in the judicial wonderland of the humanitarian doctrine where courts and counsel alike delight in casting liability upon *precise* mathematical calculations employing *imprecise* estimates or assumptions of speed and distances * * *", a characterization first drawn by Judge Stone in Dillon v. Hogue, Mo.App., 381 S.W.2d 599. In John-

son v. Bush, Mo.App., 418 S.W.2d 601, the court declined to hold a plaintiff contributorily negligent as a matter of law "through a process of extrapolation" from estimates of "speed, distance, position and time." The court there said: "Though calculations based on such estimates sometimes have a special relevance in the arcane world of the humanitarian doctrine, see Herr v. Ruprecht, Mo., 331 S.W.2d 642, 648–649(7); Dillon v. Hogue, Mo.App., 381 S.W.2d 599, 602, and authorities cited note 1, it is sufficient to say that as far as plaintiff's primary submission is concerned, the witnesses' estimates of speed, distance, time and position cannot realistically be classified as absolute facts which the jury was bound to accept as true, and that calculations based on such estimates and approximations cannot convict a plaintiff of contributory negligence as a matter of law." And in Henrickson v. Resnik, Mo.App., 390 S.W.2d 610, the plaintiff, after stopping at a stop sign, proceeded into an intersection and collided with defendant's oncoming automobile. Defendant counterclaimed, predicating his case (in part) upon plaintiff's primary negligence in entering the intersection when defendant was approaching so closely as to constitute "an immediate hazard of collision" (in which case the statute required plaintiff to "yield"). Upholding defendant's right to recover on the basis of primary negligence, the appellate court pointed out that plaintiff had a clear view in the direction of defendant's vehicle and should have seen it approaching if she had made a proper observation, that her duty to stop (or otherwise yield) continued into the intersection if it reasonably appeared that defendant's approach had created an immediate hazard of collision, and that at her estimated speed of two to four miles per hour "she could then have stopped almost instantly." Further ruling that defendant was not contributorily negligent as a matter of law, the court said:

"The plaintiff, both in her brief and in her argument, had laid great stress upon certain parts of the testimony dealing with the relative speeds and positions of the two vehicles immediately before and after the collision, and much emphasis is laid upon precise calculations based on such evidence. Granting that such arguments may be appropriate where a case is triable only under the humanitarian doctrine, and may indeed have some analogy here, we think this appeal cannot realistically be decided upon conclusions reached by the application of mathematical formulae to the evidence. See Herr v. Ruprecht, supra, 331 S.W.2d at 648–649(7). The record makes it abundantly clear that both parties reconstructed the accident by means of evidence which consisted in large part of approximations, estimates and 'best judgments', and that both the parties and the witnesses were attempting to recall in meticulous detail a transaction which happened, so to speak, in the space of a few seconds."

The case of Herr v. Ruprecht, Mo.Sup., 331 S.W.2d 642, which also involved a right angle collision of two automobiles at an intersection, strongly supports our view that the evidence is sufficient for submission of "the reasonable likelihood of collision" and failure "to stop" issues in this case. The essential liability question considered by the Supreme Court in the Herr case was whether plaintiff's automobile was approaching so closely on a through highway as to constitute "an immediate hazard" and whether defendant, who had observed a stop sign and stopped his vehicle, knew or should have known, of such danger and yielded the right of way, as the statute required, instead of driving into the intersection. The defendant, as in the instant case, complained that the evidence was insufficient, particularly in respect to the position of plaintiff's car when defendant started across the intersection and, relying mainly on humanitarian cases, undertook by calculations based upon various assumed rates of speed of defendant's vehicle, ranging from two to ten miles per hour, to demonstrate that the jury was not

justified in finding that plaintiff's car was so close as to constitute "an immediate hazard". Ruling against those contentions and rejecting the necessity of computing mathematical possibilities, the Supreme Court in opinion by Judge Eager held as follows:

"Defendant cites, to a large extent, humanitarian cases where evidence of a driver's ability to avoid the collision is imperative and precise calculations are often required. The theory may have some analogy here, but we cannot decide this case upon the peculiar characteristics of that doctrine, nor are we required to make precise calculations. * * * Certainly here plaintiff was 'approaching',—at *some* distance and at 40 miles per hour. He was within a range where a collision was likely to occur, and by defendant's own evidence she could see for probably a quarter of a mile eastwardly. Defendant's rate of speed in miles per hour was not shown but, in her written argument, her counsel calculate the distance plaintiff's car would have covered at 40 miles per hour while the defendant would have moved the 53 feet necessary for her to clear the crossing at assumed speeds ranging from two to ten miles per hour. This computation serves at least to demonstrate that the statutory language 'so closely * * * as to constitute an immediate hazard' is a variable term, depending in part on matters peculiarly within the knowledge and control of the driver crossing the through highway. * * * It was not necessary for the plaintiff to prove directly his distance from the intersection when the defendant entered it, or the speed at which the defendant was crossing. We think that this evidence fairly supports an inference that at some point, either when defendant entered the intersection or while she was proceeding slowly therein and still south of plaintiff's line of travel, plaintiff's car was so close as to constitute an 'immediate hazard' and that defendant's duty to 'yield' arose. On all the evidence we conclude that a submissible case was made on the issue as submitted."

In our opinion there is no essential difference between an "immediate hazard" arising from the close approach of an automobile under the circumstances prevailing in the Herr case, and a condition of danger arising from the same cause when it bears the designation "reasonable likelihood of collision." For that reason we consider that the rulings in the Herr case apply with equal strength to the issues raised in this case, in view of the very similar fact situations involved.

It was reasonably evident to the jury and they could fairly believe that when the light facing defendant turned green and as he prepared to start forward from rest to enter the intersection, or very shortly thereafter, the Reese car was as close to the intersection as ninety feet, traveling in excess of forty-five miles per hour. From the established fact that when the brakes of the Reese car were applied it skidded sixty feet before colliding with defendant's car, skidded another seventy feet after impact and knocked defendant's car sideways a distance of ninety feet, and taking into consideration defendant's admission that he was hit "immediately" after he started, the jury could well believe the Reese car was traveling much in excess of forty-five miles per hour and at a very high rate of speed. Under those circumstances, the jury could reasonably find that Reese was then "within a range where a collision was likely to occur", Herr v. Ruprecht, supra, (and in fact did occur); that defendant drove into the intersection directly in the path of Reese's car when such danger of collision with it was imminent and apparent, and that defendant, with his view unobstructed and good visibility, would have realized, had he performed his duty to keep a lookout, "that there was a reasonable likelihood of collision" in time thereafter "to have stopped" his vehicle short of the collision. Defendant himself admits that he "should have seen him

 

(Reese) come on down the road * * * If I had looked that way, but I didn't."

Although there was no evidence before the jury to show the distance required for stopping defendant's vehicle at any given speed, they could nevertheless reasonably find that defendant could have stopped and thereby have avoided the collision. Defendant could have accomplished that preventive measure by either of two methods. He could have "stopped" simply by remaining stationary, where he had come to a standstill in the first place. Fulfillment of the legal duty to "stop" pursuant to traffic signal or sign contemplates and includes a cessation of movement for a sufficient length of time necessary to satisfy the purposes of safety which those devices were designed to accomplish. See Moore v. State, 140 Tex.Cr.R. 482, 145 S.W.2d 887. Alternatively, even after defendant started to move his car forward toward the intersection, there were infinitely numerous low rates of initial speed, as he was gaining velocity, at which he could have stopped before reaching the point of collision. It is judicially noticed that an automobile traveling at a speed of two to four miles per hour could have been stopped "almost instantly", Henrickson v. Resnik, supra, (390 S.W.2d 610); at two and one-half miles per hour "almost instantly— within a matter of a very few feet", Wegener v. St. Louis County Transit Company, Mo.Sup., 357 S.W.2d 943; at five miles per hour "within a very few feet if not instantaneously", Smith v. St. Louis Public Service Co., Mo.App., 252 S.W.2d 83; and at five miles per hour or less "almost instantly—within a few feet", Hamell v. St. Louis Public Service Co., Mo.App., 268 S.W.2d 60; and, even at ten miles per hour, excluding reaction time, "within nine feet", Loyd v. Moore, Mo.App., 390 S.W.2d 951.

Additional cases relied upon by defendant include: Reed v. Burks, Mo.App., 393 S.W.2d 377, where two cars "sideswiped" on a narrow blacktop; O'Neill v. Claypool, Mo.Sup., 341 S.W.2d 129, where there was no evidence to show where the defendant motorist had stopped or what possible view she could have had of plaintiff's oncoming vehicle; Zalle v. Underwood, Mo.Sup., 372 S.W.2d 98, a case where two vehicles approached each other on the same highway in opposite directions, no intersection was involved, and there was no evidence to show the location or speed of the vehicles at any given time; Ochs v. Wilson, Mo.App., 427 S.W.2d 748, which involved three cars and two successive collisions, where it appeared that defendant had only a "split second" after the first collision in which to take preventive action. The above cited cases involve facts so dissimilar to the facts in this case that we do not consider them persuasive on the issues here raised.

We rule that plaintiff made a submissible case to support the giving of Instruction No. 4 and that the trial court properly refused to set aside the judgment.

The judgment is affirmed.

All concur.