Opal O'NEILL, Respondent,

v.

Zan B. CLAYPOOL, Administrator of the Estate of Lillian Claypool, Deceased, Appellant.

No. 47883.

Supreme Court of Missouri,

Division No. 1.

Dec. 12, 1960.

Farrington & Curtis, E. C. Curtis, Thomas Strong, Springfield, for appellant.

William C. Bland, Duane Cox, John B. Newberry, Springfield, for respondent.

HOUSER, Commissioner.

This is an action for damages for personal injuries and property damage arising out of an intersectional collision of two automobiles. Pending trial defendant died and her administrator was substituted as party defendant. The trial jury returned a verdict for the administrator. Plaintiff's motion for a new trial was sustained for error in the giving of Instruction No. 5. From that order and judgment the administrator appealed to this Court, which has jurisdiction since plaintiff prayed for $61,-500.86 and there was a judgment for defendant.

Plaintiff sought to go to the jury on three theories: (1) failure to have two sets of adequate brakes in good working condition; (2) failure to yield right of way to plaintiff, on the theory that plaintiff's automobile entered the intersection first; (3) failure to maintain a vigilant lookout ahead and laterally on approach and entry into the intersection. The circuit court refused to submit the case on theories (2) and (3), but submitted it on (1).

The administrator's first point is that no new trial should have been awarded to plaintiff for error in an instruction because plaintiff did not make a submissible case of negligence; that there is no substantial evidence that defective brakes caused the accident, or of failure to maintain a vigilant lookout, or that plaintiff entered the intersection first and had the right of way; that the administrator's motion for a directed verdict at the close of the evidence should have been sustained.

The collision occurred in the northeast quadrant of the intersection of Catalpa and Oak Grove Streets in Springfield. A Ford westbound on Catalpa, driven by Lillian Claypool, collided with a Pontiac north-bound on Oak Grove, driven by Opal O'Neill. There were no eyewitnesses except the two drivers. Plaintiff Opal O'Neill was not permitted to testify, the other party to the transaction being dead. Plaintiff attempted to make a submissible case by introducing statements and admissions of Lillian Claypool, photographs of the Pontiac showing the physical damage, evidence of the physical characteristics of the intersection, the surrounding circumstances existing there a few minutes after the collision, and the testimony of an expert accident analyst. Defendant offered no evidence.

Catalpa and Oak Grove are asphalt streets, the pavement of each of which is 20 feet wide. Catalpa runs east and west. Oak Grove runs north and south. They intersect in a jog. The north edge of Catalpa east of the intersection is on a line with the south edge of Catalpa west of the intersection. The collision occurred between eight and nine o'clock a. m. It was either raining at the time of the accident or had stopped raining shortly before, for the pavement was wet. It was "pretty slick" when wet. Lillian Claypool was driving her Ford west. Plaintiff was driving her Pontiac north. When the wheels of an automobile westbound on Catalpa go into Oak Grove the driver can see about two blocks south on Oak Grove. There was no evidence of the distance a driver could see south on Oak Grove from any particular point east of that point on Catalpa. The lot on the southeast corner of the intersection was surrounded by a woven wire fence. Facing Oak Grove there was a very tall and large wild cherry tree, two Chinese elms, and several smaller three or four-year-old trees scattered around. There were shrubs on the west side against the fence. There was a large, spreading forsythia bush at the west fence. Outside the yard there was a hickory tree. Facing Catalpa there was a large maple, a smaller maple, and a pussywillow tree near the west corner of the lot "almost like a shrub or bush" but taller than a shrub—"almost as high as the ceiling." It

branched out fairly low. The pussywillow was five or six feet from the fence on the Catalpa side and ten feet from the fence on the Oak Grove side. There were shrubs five or six feet from the north fence, "not quite as tall as a lady's head." The collision occurred on December 21, after the leaves had fallen. There was no stop sign for westbound traffic on Catalpa. The day before the accident the footbrakes on the Ford did not have enough fluid in them. They were "not as good as they should be." Lillian Claypool called a garage and arranged to have them fixed. She was driving to the garage to have the brakes repaired when the collision occurred. She went up to the intersection and stopped, looked both ways before turning and saw nothing coming. Then she turned right, into the intersection. After the Ford barely started, going five to ten m. p. h., and while the Ford was in its right turn, the left front portion of the Ford struck the right portion of the northbound Pontiac, about the rear door. According to Lillian Claypool's statement the Pontiac "was coming at a high rate of speed," but the expert was of the opinion that the Pontiac was not traveling at a high rate of speed at the time of impact. Lillian Claypool saw the Pontiac "after she had turned into the intersection," but there is no evidence of the position of the Pontiac or the distance separating the two cars when she first saw, or could have seen, the Pontiac. It was a light blow but sufficiently severe to throw the Pontiac "out of the Ford's way, and into a spin." The Pontiac spun around because of the blow and the wet surface of the street. The Pontiac came to rest on the east side of Oak Grove 62 feet north of the intersection, headed south, with its left and left top caved into a tree. The Ford came to a stop in the intersection, according to some witnesses. According to others the Ford came to a stop only a few feet south of the Pontiac, on the west side of Oak Grove, headed north. There was light damage to the left front fender and headlight of the Ford. Heavier but not extensive damage was done to the Pontiac's right rear side. There were no burned rubber tire or skid marks on the pavement, but the traction of the tires eliminated most of the rain water so that the tracks of the two vehicles could be seen. The tracks of the Pontiac, going north in its own right-hand or east lane, swerved or veered toward the left or west towards the middle of the street before reaching the intersection, "just a little before she got to the intersection," and then veered back to the right. The tracks of the Ford, starting its right turn, met the tracks of the Pontiac and the two sets of tracks crossed in the intersection. The front wheels of the Pontiac "were cutting back to the right at the time the tiremarks crossed," and that is where the Pontiac started its spinning-around motion. It was not a strong, hard impact when the cars collided, but a light impact. It was at an angle—not a straight blow into the side of the Pontiac—a "corner-scraping damage." The Pontiac was traveling "faster" than the Ford. Mud and debris were found in the northeast quadrant of the intersection. Scuffmarks showed where the Pontiac had gone around sideways and north into the tree. The Pontiac hit the tree a "pretty hard" impact, traveling then from 25–28 m. p. h. A police sergeant tested the Ford's footbrakes at the scene of the accident. He pumped the brakes. There might have been some pressure when he pumped, but the pedal went all the way to the floor and there were no brakes. He did not test the emergency hand brake. After the accident Lillian Claypool telephoned for tow-in service. On direct examination, over objection of the defendant on the ground that it was a conclusion, the garage man was permitted to testify that Lillian Claypool told him "that her brakes failed and she ran into this lady, causing the accident * * * that she came to this intersection, she had no brakes, therefore hitting the lady causing the accident." On cross-examination he modified this testimony by saying, "She told

me her brakes was bad" and that she " 'had an accident' "; that "she ran into the lady and had an accident * * * and that's all she said." At the shop the mechanic found a bad master brake cylinder, dry of fluid, in which condition "you would not have any brakes." He did not check the hand brake. She always kept her automobile in "tip top" mechanical condition.

The expert testified: Normal reaction time is one second. During one second you travel 36 feet at 25 m. p. h.; 44 feet at 30 m. p. h. On wet level blacktop pavement with good brakes it takes 43 feet to slow down from 35 to 25 m. p. h., and 54 feet to slow down from 40 to 25 m. p. h. It would require a distance of 94 feet to stop on wet blacktop at 25 m. p. h., counting reaction time and braking distance. The tires are dragging on a car that is spinning "just the same as brakes being applied," with the same friction and braking traction on certain wheels. Therefore a spinning car will stop just as soon as one being fully braked.

Did plaintiff make a case on either of the three theories? We think not.

■ (1) *Inadequate brakes.* To make a submissible case under the statute[1] and ordinance[2] requiring motor vehicles to be provided with two sets of adequate brakes, kept in good working order, plaintiff would have to prove facts and circumstances from which a duty to slow down or stop would arise. Failure to provide statutory brakes would impose liability on the administrator if his decedent saw or in the exercise of the highest degree of care should have seen the Pontiac approaching and knew or should have known of the danger of collision therewith in time, including reaction time, to have applied the brakes, and if the timely application of adequate brakes in good working order would have avoided a collision. If Lillian Claypool did not see or if, in the exercise of the highest degree of care, she could or should not have seen the approaching Pontiac before it was too late to apply the brakes and avoid a collision, the defective condition of the brakes would be an immaterial circumstance and her failure to have the Ford properly equipped with brakes would have no causal connection with the collision. The defective condition of the brakes, in other words, would be germane only if the defect had a causal connection with the collision. Bean v. Butler, 155 Me. 106, 151 A.2d 271, loc. cit. 275. It would not be sufficient to show merely that an automobile operating with inadequate brakes collided with another automobile. In a negligence per se case, as in other cases, it is not sufficient merely to show negligence and injury. A causal connection between the two must be established. Beezley v. Spiva, Mo.Sup., 313 S.W.2d 691, loc. cit. 697; Lochmoeller v. Kiel, Mo.App., 137 S.W.2d 625, loc. cit. 629; Krelitz v. Calcaterra, Mo.Sup., 33 S.W.2d 909, loc. cit. 911; McWhorter v. Dahl Chevrolet Co., 229 Mo.App. 1090, 88 S.W.2d 240, loc. cit. 245, and cases cited.

■ A review of this record fails to reveal any evidence of sufficient time, including reaction time, and sufficient distance between the converging automobiles, for Lillian Claypool to have used properly working brakes to any saving advantage. The position of the Ford when it stopped for the intersection, a matter of great importance, is left to generalities ("She went up to the intersection"). Nothing in the evidence indicates how far south on Oak Grove Lillian Claypool could see at that time, or at any other time until her front wheels were actually entering the intersection. The relative positions of the two vehicles when the Ford started up, or when the Ford's front wheels entered the intersection, or at any other time prior to the moment of collision, are unknowns. Whether Ford or Pontiac entered the intersection first is not shown and cannot be inferred

1. RSMo1949, V.A.M.S., Section 304.560 (3).

2. General Ordinance No. 1052, § 32.110 (a), Ordinances of the City of Springfield, Missouri.

from the evidence. The evidence with respect to the speed of the Pontiac is in direct conflict ("high rate of speed" vs. "Not any high rate of speed") and neither judgment on speed is definite enough to depend upon in calculating the ability of the driver of the Ford to avoid the collision. The distance between the front of the Ford and the line of travel of the Pontiac at a time when danger of collision with the Pontiac could have been known was left to conjecture. The distance within which the Ford traveling 5–10 m. p. h. could have been stopped with brakes complying with the statute, on wet, slick blacktop was not shown.

The extrajudicial quasi-admission of Lillian Claypool that "she had no brakes, therefore hitting the lady, causing the accident" was not a sufficient basis upon which to submit to the jury the question of causation. Such evidence, as in the case of concessions of fault, Grodsky v. Consolidated Bag Co., 324 Mo. 1067, 26 S.W.2d 618; Friedman v. United Rys. Co. of St. Louis, 293 Mo. 235, 238 S.W. 1074; Huelsmann v. Johnston, Mo.App., 213 S.W.2d 641; Waite v. Boutross, 225 Mo.App. 724, 39 S.W.2d 454; Taylor v. Owen, Tex.Civ.App., 290 S.W.2d 771; Jernigan v. Jernigan, 238 N.C. 444, 78 S.E.2d 179; 31 C.J.S. Evidence § 272, p. 1026, is admissible in evidence as an admission against interest, and while not conclusive or binding, Graber v. Wells, Mo.App., 7 S.W.2d 719, is a circumstance for the consideration of the jury, Ginter v. O'Donoghue, Mo.App., 179 S.W. 732, for whatever it is worth. Runyan v. Marceline Coal & Mining Co., 186 Mo.App. 707, 172 S.W. 1165. Verbal admissions of this type, however, which are regarded as "the weakest and most unsatisfactory kind of evidence," Layton v. Chinberg, Mo.Sup., 282 S.W. 434, loc. cit. 437, should be received with caution and subjected to careful scrutiny for the reason that this class of evidence is subject to error, imperfection and mistake. The witness may be misinformed or unable to repeat the admission in the exact language the declarant used so that by altering, omitting or changing the words (intentionally or innocently) he may convey a meaning altogether different from what was actually said by the declarant. Greenleaf on Evidence, Vol. I, § 200; Jones on Evidence, § 297. The weakness and unreliability of such evidence and the necessity for receiving it with caution is illustrated in the instant appeal. The mechanic testified on direct examination that declarant stated to him that the failure of her brakes *caused the accident*. On cross-examination, however, he changed his version of the declarant's statement, leaving out the element of causation and confining it to a statement that her brakes "were bad" and that she "ran into this lady" and "*had an accident*." Viz.:

"Q. Now, Mr. Pippen, did you ever tell me, in any one of those conversations, that Miss Claypool told you that she caused that collision? A. She said her brakes was bad and—

"Q. —Did you tell me that? A. Yes, sir.

"Q. Did you tell me that she said she caused that collision? A. She told me her brakes was bad; and I told you the same thing out there in the hall yesterday.

"Q. All right. And what she told you was that 'my brakes were bad and I had an accident'—that's what she told you, isn't it? A. That's right.

"Q. And that's what you told me twice and that's what you told Tom Strong? A. She ran into the lady and had an accident.

"Q. Ran into a lady and had an accident. A. That's right.

"Q. And that's all she said, isn't it? A. That's right. That's what I said she said.

"Q. And you are sure of that, aren't you, Johnie? A. Yes, sir."

■ The extrajudicial quasi-admission that defective brakes caused the accident was weak, uncertain, indefinite and in effect repudiated. It was a mere scintilla of evidence, entitled to little weight. It was not evidence of the substantial character necessary to support a judgment. Layton v. Chinberg, supra, 282 S.W., loc. cit. 436, 437. In this connection see Binewicz v. Haglin, 103 Minn. 297, 115 N.W. 271, 15 L.R.A.,N.S., 1096; Jones v. Harris, 122 Wash. 69, 210 P. 22.

Plaintiff failed to prove facts establishing directly or by inference that there was sufficient time and distance available to Lillian Claypool in which, by the exercise of the highest degree of care and with adequate brakes, she could have stopped or slowed down sufficiently to avoid the collision. There is a complete absence of facts from which a duty to apply the brakes would arise, and a failure to connect the statutory violation with the accident and injury.

■ (2) *Right of way.* There was no substantial evidence that the Pontiac entered the intersection before the Ford so as to give the Pontiac the right of way. This is an unknown and any attempt to draw inferences with reference to this fact, in view of the absence of evidence on the question, would constitute rank speculation.

■ (3) *Lookout.* There was no substantial evidence that Lillian Claypool failed to maintain a careful and vigilant lookout ahead and laterally as she approached and entered the intersection. The only evidence on that question is that she looked both ways, saw nothing, entered the intersection, and then saw the Pontiac after she had turned into the intersection. As indicated, there is no evidence of the position of the Pontiac at any given time when the jury could have found that Lillian Claypool could have seen the Pontiac in time to take effective precautionary action. It was not shown that she did not see the Pontiac at the earliest possible moment. Negligent failure of Lillian Claypool to maintain a careful lookout cannot be established in the absence of substantial evidence from which a jury could find that in the exercise of the highest degree of care she could have seen the Pontiac sooner than she did see it. Levin v. Caldwell, Mo.Sup., 285 S.W.2d 655, loc. cit. 659. She was not obliged to see through impenetrable objects, bend her vision around them, or dismount and go around in front to reconnoiter. Fuzzell v. Williams, Mo.App., 288 S.W.2d 372, loc. cit. 376.

Accordingly, there having been no basis for submitting the case on any of the three theories, the court should have directed a verdict for defendant at the close of the evidence. This obviates the necessity of considering the merits of the several alleged procedural errors (in the giving of instructions and exclusion of evidence) briefed.

The order and judgment of September 11, 1959 is reversed and the cause is remanded with directions to reinstate the judgment for defendant entered June 5, 1959.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.