Galen MURPHY, a Minor, by His Next
Friend, Cleda Murphy, and Harold Murphy
and Cleda Murphy, Respondents,

v.

Donald L. LAND, Appellant.

No. 52527.

Supreme Court of Missouri,
Division No. 1.

Nov. 13, 1967.

William A. Moon, Springfield, for respondents.

Allen, Woolsey & Fisher, Harold J. Fisher and Raymond E. Whiteaker, Springfield, for defendant-appellant.

HOUSER, Commissioner.

This is an action for damages. In Count I 5-year-old Galen Murphy sued pro ami for $25,000 damages for personal injuries sustained when he was struck by an automobile owned and operated by defendant Donald L. Land, while Galen was riding on a skateboard. In Count II Galen's parents sued for $1,300 damages for medical expenses incurred. A trial jury returned a verdict for defendant, which was set aside by an order granting a new trial on the ground that the court erred in giving Instruction No. 5. In its order the court declared that No. 5 was prejudicial in view of the giving of Instruction No. 4 at defendant's request.

Defendant has appealed, claiming first that there was no error in giving No. 5 and that if there was error it was harmless. Counts I and II were submitted to the jury in separate instructions, each of which submitted negligent failure to slacken speed or swerve under the humanitarian doctrine. At defendant's request the court gave two instructions, which follow:

"INSTRUCTION NO. 4

"Your verdict must be for defendant, Donald L. Land, unless you believe:

"First, defendant, Donald L. Land, knew or by using the highest degree of care could have known of plaintiff's position of immediate danger, and

"Second, at the moment when defendant, Donald L. Land, first knew, or by the highest degree of care could have known, of plaintiff's position of immediate danger, defendant, Donald L. Land, then had enough time by using such care to have avoided injury to plaintiff by either slackening his speed or swerving, and

"Third, defendant, Donald L. Land, had the means available to him to have avoided injury to plaintiff by either slackening his speed or swerving, and

"Fourth, defendant, Donald L. Land, by using the highest degree of care could have avoided injury to plaintiff by either slackening his speed or swerving without endangering himself or others, and

"Fifth, plaintiff sustained damage as a direct result of defendant's, Donald L. Land's, conduct."

## "INSTRUCTION NO. 5

"Your verdict must be for defendant, Donald L. Land, unless you believe that defendant, Donald L. Land, was negligent."

■ Both of these are converse instructions. Number 4 is MAI No. 29.06(6). Number 5 is an adaptation of MAI No. 29.04(1). Number 4 converses No. 2, given by the court at plaintiff's request (submitting humanitarian failure to slacken speed or swerve). Number 5 converses all negligence generally. Number 5 violates the spirit of MAI No. 29.01, which states that a defendant is entitled to *a* converse of plaintiff's verdict directing instruction, and violates the positive direction of MAI that a defendant may give only *one* converse for each verdict directing instruction, found on pages 249, 251 and 253 of MAI. This constituted error. Nugent v. Hamilton & Son, Inc., Mo.Sup., 417 S.W.2d 939.

■ Appellant seeks to avoid this ruling by contending that under MAI No. 29.04, p. 253 [1] defendant was entitled to give two converse instructions because plaintiff gave two separate verdict directing instructions. Both of plaintiff's verdict directing instructions contained identical language submitting the same assignments of humanitarian negligence. They differed in language only in that No. 2 submitted the boy's case, while No. 3 submitted the parents' case. The quoted MAI provision authorizing multiple converse instructions refers and applies only to the conversing of submissions of multiple theories of recovery. It has no application to this situation, in which the court submitted the same theory of recovery in behalf of different parties plaintiff.

Appellant cites Morris v. Klein, Mo.App., 400 S.W.2d 461, in support of his contention that any error in the giving of No. 5 was harmless because it merely placed a greater burden on the defendant than he needed to have assumed. That case is not instructive, for the reason that multiple converse instructions were not given in that case.

■ It is our duty to determine judicially the prejudicial effect of No. 5. Civil Rule 70.01(c), V.A.M.R. All deviations from the straight and narrow path prescribed in MAI will be presumed prejudicially erroneous unless it is made perfectly clear that no prejudice has resulted. The requirements of MAI are mandatory. The burden of establishing nonprejudice is on the proponent of the instruction. That it is the policy of this Court to require strict compliance with all of the requirements of MAI is made clear in Brown v. St. Louis Public Service Co., Mo., 421 S.W.2d 255, a decision by the Court en Banc handed down concurrently herewith. Appellant has not established that no prejudice resulted from the giving of two converse instructions. We hold that this violation of MAI constituted prejudicial error.

■ Appellant contends that any error in the giving of instructions was harmless for the reason that in any event plaintiffs did not make a submissible humanitarian case in that they failed to prove that defendant had the means and appliances at hand to avoid the collision after the boy entered a position of immediate danger. This requires the statement of the facts in the light most favorable to the plaintiffs.

At about 11:15 o'clock on a bright, sunny September morning defendant was driving his automobile at a speed of 20–30 m. p. h., proceeding north on a 27-foot blacktop street, with the right side of the automobile

---

1. Wherein it is stated that "When plaintiff submits two separate verdict directing instructions, defendant may converse each such submission with any of the approved converse instruction forms."

about 6 feet from the east edge of the pavement, in a "thickly housed" neighborhood just outside the city limits of Springfield. Along there the street was straight and fairly level with just a slight pitch to the south. The pavement was dry. On the east side of the street there lived a family named Davis. The Davis property was enclosed by a chain link fence 4 feet high. The fence ran parallel to the street in the front of the lot for a distance of 90 feet. It was located about 2 feet east of the east edge of the 1½ foot concrete apron (gutter) abutting the east edge of the pavement. There was an opening toward the north end of the fence into the Davis concrete driveway. The driveway was 10 feet wide. The opening in the fence could be closed by double swing gates but the gates were open at the time in question. The driveway, 47 feet long, extended from the east edge of the street to the Davis garage. The driveway sloped up gradually from street to garage. A motorist driving north could see into the Davis driveway and could see children in the driveway as far south as 125–150 feet; could see "practically all" of the driveway, "a good two thirds or better of the way back up the driveway." Defendant had lived in the neighborhood for 6 or 7 years. He knew that there were "a good many children in that particular area" and was aware that "they played there adjacent and along the street."

At the time in question Galen and other children were playing in the drive. Galen coasted down the Davis driveway on a skateboard and came out into the street at right angles to the automobile. Galen started his ride at the garage, 47 feet from the street. A skateboard is a piece of board to which skate wheels are attached. As he rode down the driveway Galen was seated on the skateboard, with his knees in front of his body, his hands holding onto the sides of the board. There is no evidence as to his speed at any time, except that he came out of the drive "at a pretty good gait." When defendant first saw the boy the automobile was about 40 feet south of the point of impact. The boy was sitting on the skateboard, coming out of the Davis driveway into the path of the automobile. The boy was at that time still on the extreme lower (west) edge of the driveway. He was "just coming out of the opening"—out of the gate. The actual braking distance of the car at 20 m. p. h. was 18 feet; at 25 m. p. h., 28 feet; at 30 m. p. h., 40 feet. Defendant immediately applied the brakes as soon as he saw the boy. All four wheels left tire skid marks on the pavement, variously estimated at from 24 to 45 feet in length. The skid marks were straight. The right-hand skid marks were 5–6 feet west of the east curbing. There were no automobiles, pedestrians or other obstructions to interfere with or prevent defendant from swerving to his right or left. Defendant made no effort to swerve and did not swerve to the right or left to go around the boy. This he admitted at the hospital, where defendant told the parents that after thinking about it at home he wondered why he didn't swerve to miss Galen; that he had not tried to miss him; that he had just "put on his brakes and went straight." The right front of the automobile struck the child after the child had proceeded a distance of 6 to 7 feet into the street. The front of the automobile stopped at a point adjacent to the center of the Davis driveway and about 6 feet from the curb. After the accident the boy was lying on the pavement 5 or 6 feet west of the east curb, "right in front" of the right front wheel of the automobile, 3 or 4 feet in front of the car, to the right side of it. The first time the boy saw the automobile the boy was "about on the right hand side out in the street" and the automobile was about 45 feet south of the center of the Davis driveway. He screamed; the brakes started squealing; he tried to turn the skateboard over so that he would fall off, and as he was making this effort the car hit him.

◼ We are of the opinion that plaintiffs made a submissible humanitarian case of failure to slacken speed or swerve, con-

sidering the evidence in the light most favorable to plaintiffs. Defendant's duty to act arose when Galen came into a position of immediate danger. He came into a position of immediate danger when defendant saw, or by the exercise of the highest degree of care could have seen, Galen moving toward the path of the automobile, apparently intending to continue into its path and apparently oblivious of its approach. Triller v. Hellwege, Mo.Sup., 374 S.W.2d 104; Williams v. Ricklemann, Mo.Sup., 292 S.W.2d 276; Wright v. Osborn, 356 Mo. 382, 201 S.W.2d 935. "It is good law that a person driving an automobile along a city street must take note not only of persons who are actually in the pathway of danger, but of those who are approaching and apparently about to go into danger, and to act on such appearances." Oliver v. Morgan, Mo.Sup., 73 S.W.2d 993, 996 [6]. It was defendant's duty to keep a vigilant lookout both ahead and laterally. Williams v. Ricklemann, supra, 292 S.W.2d, l. c. 281 [6]; Wright v. Osborn, supra, 201 S.W.2d, l. c. 938. Defendant did not see Galen until he was about to enter the street, on the extreme lower edge of the driveway, but that did not necessarily mark the point when defendant's duty commenced. As indicated, his duty began at that point on Galen's trip down the driveway when by the exercise of the highest degree of care defendant could have seen the boy moving toward the path of his automobile, apparently intent on pursuing his course, and apparently oblivious of the automobile's approach. Wright v. Osborn, supra, 201 S.W.2d, l. c. 938.

Visibility up the driveway was a hotly contested issue of fact. Defendant's witnesses and photograph evidenced a complete obstruction of view. In determining the question of submissibility, however, we must ignore defendant's evidence and accept the testimony of Galen's parents on this issue. The latter testified that a northbound motorist could have seen the driveway and children up in the driveway at least two thirds of the way from the west end of the driveway to the garage, for as far south as 125–150 feet. On this testimony the jury could have found that defendant could have seen Galen on the skateboard, and that he came into a position of immediate danger, when he was halfway down the driveway; that it was reasonably apparent that he intended to continue in his course down the driveway and into the street; that he would not turn to one side (skateboards have no guiding mechanism) and that in all reasonable likelihood the forward movement of the skateboard would not be interrupted until it had run its course. The jury could have found obliviousness, which widens and extends the zone of danger. Triller v. Hellwege, supra. While we do not know Galen's speed or how long it took him to traverse the 30 feet between a point halfway up the driveway and the point of impact, the record supports the conclusion that if defendant had seen Galen halfway up the driveway, or at any point closer to the street which would have afforded defendant an opportunity to see him one second earlier than he did, and had defendant then acted promptly, he would have had the means at his disposal to avoid the collision.

The median speed testified to was 25 m. p. h. Taking the braking distance at that speed (28 feet) and adding the distance an automobile travels at that speed during ¾ second reaction time, (28 feet plus) yields a stopping distance at median speed of 56 feet plus. On this type of calculation defendant's stopping distance at 20 m. p. h. was 52 feet; at 30 m. p. h., about 79 feet. If as defendant testified he was 40 feet south when he first saw Galen, his automobile one second earlier would have been 69 feet, 76 feet or 88 feet south when he first could have seen the boy, depending on which of the three speeds was correct. All of these distances are within the 125–150 foot estimate of the distance from which northbound motorists could see children on the driveway. Under any speed testified to, therefore, defendant had ample time and distance within which

to stop short of collision, if he had seen the boy one second earlier than he did see him. This conclusion is based upon the assumption that it would take Galen one second or more to traverse the distance from the middle to the lower edge of the driveway (approximately 23 feet), but of this fact we take judicial notice, considering the gradient, as revealed by the photographs and testified to by a witness (i. e., that it was a *gradual* slope). With the ability to stop in the distance available, it is evident that defendant had the ability to avoid the collision by slackening speed, Edwards v. Dixon, Mo.App., 298 S.W.2d 466, 470, or swerving (the street was 27 feet wide and there were no parked cars, other children, or other obstructions to prevent him from swerving).

On the question of submissibility see Anderson v. Prugh, 364 Mo. 557, 264 S.W.2d 358, wherein it was held that a submissible case of humanitarian negligent failure to slacken speed and stop was made in spite of the fact that the evidence of the speed of the sled was ruled improperly admitted and the only evidence of its speed remaining in the record was that it was coming down the hill "pretty fast." The facts showed that plaintiff's peril was discoverable and there was evidence of defendant's ability to stop if he had discovered the sled when he was farther from the intersection than his stopping distance. In Williams v. Ricklemann, supra, the speed of the child as she approached the point of impact was not in evidence. The stopping distance required by the defendant was shown, and on the basis of discoverable peril and ability to stop short of the point of impact, it was held that a submissible case of humanitarian failure to slacken speed or swerve was made. In Dillon v. Hogue, Mo.App., 381 S.W.2d 599, 603, it was said: "So, in considering whether a submissible case was made on humanitarian negligence in failing to stop, our simplified inquiry is whether defendant could have stopped within the available intervening distance of 170 to 124 feet after

he saw Mike. If he could, it becomes unnecessary for us to assume or find, and thus wholly immaterial, precisely how far or precisely how fast Mike moved after he was sighted by defendant." Finally, see Irvin v. Kelting, Mo.App., 46 S.W.2d 924, 926 [4].

For the error in the giving of instructions the judgment is affirmed and the cause remanded for a new trial.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HENLEY, P. J., and SEILER, J., concur.

STORCKMAN, J., concurs in result.