**STATE of Missouri ex rel. STATE HIGH-WAY COMMISSION of Missouri, Plaintiff-Respondent,**

v.

**Bob L. BEATY, Defendant-Appellant.**

**No. 9292.**

Missouri Court of Appeals, Springfield District.

Jan. 23, 1974.

Motion for Rehearing or to Transfer to Supreme Court Denied Feb. 11, 1974.

Application to Transfer Denied March 11, 1974.

Robert L. Hyder, John H. Gladden, Jefferson City, for plaintiff-respondent.

Bob J. Keeter, Robert W. Schroff, Schroff, Keeter & Glass, Springfield, John M. Belisle, Osceola, for defendant-appellant.

JACK A. POWELL, Special Judge.

In this case, the State of Missouri ex rel. State Highway Commission, sought to recover from defendant Bob L. Beaty the sum of $46,317.11 for damages done to a bridge numbered by plaintiff as G–711, and located on U.S. Route 54 in Vernon County, Missouri. The trial by jury was held in Polk County, Missouri, and resulted in a verdict for plaintiff against the defendant in the amount of $27,300. Defendant appeals.

On the afternoon of July 31, 1970, the defendant was driving a 1949 Mack tractor and pulling a lowboy trailer. Loaded on the lowboy trailer was a Caterpillar tractor bulldozer which weighed in excess of 20 tons. The Caterpillar was equipped with a 12-foot blade, and was loaded so as to be centered on the lowboy, with the blade faced toward the front of the Mack tractor. The total length of the tractor-trailer unit was 40 feet. The blade extended out from the trailer on each side and was approximately four feet off the ground.

The bridge involved was 20 feet wide. It was composed of four sections. There was a small section at each end of the bridge, each such section being 42 feet in length. The remaining two sections are referred to as superstructures, with the sides rising higher into the air, and each section being 82 feet in length. Thus, the bridge was 248 feet in length.

The unit driven by defendant was going across this bridge when the incident occurred. Defendant had met a passenger

car coming from the opposite direction. The only witnesses of the incident who testified at trial were the defendant and his 12-year-old son.

Defendant states that just as the passenger car was passing he turned his head and it appeared that the car had cleared the dozer blade. "It looked like the dozer blade came out over the top of the trunk lid." Defendant testified that the car had passed the blade before he felt the jolt. About all he could see was the back of the dozer "just looked like the back end was up in the air." The impact caused the dozer to turn 180 degrees around on the lowboy.

The highway runs generally east and west. Defendant was traveling east. The physical evidence discloses the impact with the bridge to be 50 feet east of the west end of the bridge and on the south side of the bridge. Assuming the dozer blade was 30 feet from the front of the Mack tractor, the front of defendant's unit had traveled 80 feet onto the bridge. The passenger car traveling west had traveled at least 198 feet on the bridge and had cleared the dozer blade at the time of impact of blade with bridge.

The defendant testified that he first saw the bridge when 200 yards to 1,000 feet away. At that time he saw the car coming from the opposite direction. It was at the top of a hill east of the bridge. Defendant was traveling 40 miles per hour. Defendant testified that he started slowing down and the car started slowing down. At this time both vehicles were about 400 to 500 feet from the bridge. There is evidence that each vehicle's lights were blinked. At this time defendant was going about 25 miles per hour, and he then accelerated to 30 to 40 miles per hour. Defendant testified that he was going 20 or 25 when he went onto the bridge and the passenger car came onto the bridge "right with me." Defendant was familiar with the bridge as he crossed it about 12 times each week. "Q. Hauling a 12-foot blade, could you have made it across the bridge staying in your lane? A. No. Q. You would have had to get in the center of the bridge to go across? A. Yes." The car was always on its side of the road. Defendant testified that he thought the car was going to stop. He didn't recall the car ever leaving the highway as it approached the bridge. Defendant told the trooper that it was not "the car's" fault.

The patrolman testified that the highway was two-lane pavement and 20 feet wide on the bridge. Approaching the bridge from the west, there is sight distance of two-tenths of a mile. There is possibly more sight distance of the bridge from the east. There is a slight curve in the road west of the bridge, and the road runs uphill from the bridge east. The picture exhibits disclose clear visibility for traffic on either side of the bridge for a considerable distance in each direction.

The detailing of the foregoing facts is necessitated by defendant's complaint directed at plaintiff's verdict-directing Instruction No. 3. This instruction charged defendant with the following acts of negligence:

"First, defendant either:

failed to keep a careful lookout, or knew or by the use of the highest degree of care could have known that there was a reasonable likelihood of a collision in time thereafter to have stopped but defendant failed to do so, and . . . ."

Defendant-appellant contends that the evidence did not support the giving of the instruction. We now consider defendant's position.

Defendant cites Chandler v. Mueller, 377 S.W.2d 288 (Mo.1964); O'Neill v. Claypool, 341 S.W.2d 129 (Mo.1960), and Levin v. Caldwell, 285 S.W.2d 655 (Mo.1956), all pertaining to "lookout." In O'Neill v. Claypool, supra, the court held that there was no evidence of the position of the Pontiac at any given time when the jury could have found that defendant could have seen the Pontiac in time to take ef-

fective precautionary action. It was not shown that Lillian Claypool did not see the Pontiac at the earliest possible moment. In Chandler v. Mueller, supra, the plaintiff testified in minute detail the course of travel of defendant's car. The court held there was nothing to suggest that plaintiff failed to keep a proper lookout, because plaintiff testified he saw the other car and testified as to its continuous course of travel. In Levin v. Caldwell, supra, Caldwell testified he saw the other car when the front of his car was four to five feet from the intersection. There was no evidence to the contrary. Further, there was no substantial evidence from which a jury could have found that Caldwell could, in the exercise of the highest degree of care, have seen the other car sooner. Hence, a submission on "lookout" was error.

In the instant case, the defendant first saw the bridge when 600 to 1,000 feet away. At this time, he also observed the other car on the other side of the bridge and certainly well over 500 feet from the east side of the bridge. When the defendant reached a point 400 to 500 feet west of the bridge, he started slowing down. The car was at this time about 400 to 500 feet east of the bridge and was slowing down. Defendant thereupon resumed his speed, and there is no testimony that defendant ever observed the other car from the time it was 400 to 500 feet from the east end of the bridge, until defendant testified he observed the other car enter upon the bridge when defendant's tractor-lowboy trailer entered the bridge. Consequently, the jury could find from such evidence that the defendant failed to observe the car for a distance of 400 to 500 feet, and that if he had kept a "lookout" defendant would have observed that the car did not stop and defendant could have stopped his vehicle. A driver has a continuing obligation to keep a careful lookout, and the exhibits clearly demonstrate that there was nothing to prevent defendant from observing the car while it traveled this 400 to 500 feet. Clearly, these facts distinguish the instant

case from the cases cited by defendant and referred to herein. The basic principles governing lookout are set forth in Jefferies v. Saalberg, 448 S.W.2d 288 (Mo.App. 1969), among which we find, at page 291:

"Substantive principles of law on which plaintiff's case are founded are here noted. A motorist operating his vehicle on the public highways is under the *continuous* duty to exercise the highest degree of care at all times and to keep a careful and vigilant lookout for other persons and vehicles on the highway. . . ." (Emphasis ours).

Defendant's observation of the car while it traveled the 400 to 500 feet before entering the bridge was crucial, for defendant takes the position that he could not bring his unit to a stop after both vehicles were on the bridge. Defendant's testimony is sufficient to make a submissible case on "lookout."

■ We now direct our attention to whether or not a submissible case was made on the issue that defendant " 'knew or by the use of the highest degree of care could have known that there was a reasonable likelihood of a collision in time thereafter to have stopped but defendant failed to do so.' "

Defendant refers to the case of Greenwood v. Bridgeways, Inc., 243 S.W.2d 111 (Mo.App.1951), as authority for the proposition that a driver has no duty to decrease his speed or stop just because he sees another automobile in the street ahead of him. The duty to act would not arise until circumstances would lead him to believe that otherwise a collision would result. Defendant contends that "the danger of collision was not apparent at the time defendant realized that the vehicles would meet on the bridge. The danger of collision became apparent and should have been apparent to the defendant when the car that he was meeting on the bridge didn't get as far to the right as possible." Defendant argues that it was then too late to have stopped the vehicle moving at 20 to

25 miles per hour. We believe this argument overlooks the unusual circumstances existing at the time of the accident of which defendant had superior knowledge. The bridge was 20 feet wide. Defendant's tractor and lowboy carried a load of over 20 tons and this load was 12 feet wide. If the load was actually touching the south side of the bridge, it would still extend across the center line two feet. Therefore, if defendant permitted his load any space for safety from impact with the bridge, such extra space minimized the width of the other vehicle's lane to an equal extent. In 2 Blashfield, Automobile Law and Practice, § 111.18, pp. 564, 565 (3rd ed. 1965), the author states:

"Where two automobiles going in opposite directions approach a bridge on a public highway, it is the duty of each driver to keep on the right of the center, if the bridge is a safe two-way drive, their rights and duties being equal, even though one reaches the bridge before the other. . . .

"In approaching a bridge too narrow to admit vehicles passing each other, a driver should exercise reasonable care to avoid the contingency of being on the bridge simultaneously with another vehicle, and if the width of a truck or bus makes simultaneous passage over a narrow bridge dangerous, there may be a duty to stop and wait until the bridge is clear of traffic. . . . "

A case which sets forth these principles is that of Yell v. Wooten, 362 P.2d 1102, 1105 (Okl.1961):

"In the instant case, plaintiff had knowledge of the width of the load on his trailer and he was under a duty to take the width of the load into consideration and use due care in attempting to pass over the bridge. In 5A Am.Jur. 'Automobiles and Highway Traffic', Sec. 254, p. 388, this is said:

'The size and weight of motor vehicles are important factors in determining questions of negligence and contributory negligence in cases arising from collisions. Drivers of these vehicles have knowledge of their width and length, and clearly owe other travelers on the highway the duty to take these elements into consideration in the operation of their vehicles. * * * ' "

We should also examine defendant's own statement: "I decided to go on across the bridge because I thought the car was going to stop." He obviously knew the danger involved in meeting the car on the bridge with his load. He knew he couldn't make it across the bridge without his load extending across the center line. With this knowledge, if he observed the car approaching the bridge the last 400 to 500 feet, certainly the jury could have concluded that he knew or by the use of the highest degree of care could have known that there was a reasonable likelihood of a collision in time thereafter to have stopped. We again quote from 2 Blashfield, § 104.1, at p. 266:

"The duty of a motorist to maintain a lookout involves not only the physical act of looking but also a reasonably prudent reaction to whatever danger has been disclosed, and a motorist keeping a lookout but failing to take advantage of what it discloses is as guilty of negligence as one who fails to keep a lookout."

Defendant was the only person fully aware of the extent of the hazard that meeting another vehicle on the bridge would create. The defendant, having created the hazard, should have anticipated the events that followed. See Bunch v. Crader, 369 S.W.2d 768, 773, 774 (Mo. App.1963).

We conclude, therefore, that the jury could have determined from the evidence in this case that the defendant either failed to keep a lookout during the time that the other car was traveling 400 to 500 feet to the bridge, or, if the defendant was observing such a movement, defendant was negli-

gent in failing to stop his unit prior to entering the bridge.

Defendant also contends that the court erred in failing to declare a mistrial during the plaintiff's voir dire of the jury. Plaintiff interrogated each juror separately and then started asking general questions. The third general question posed to the entire panel was: "Q Are any of you or any member of your family employed or insured by—" and at this point defendant's counsel asked to approach the bench. Outside the hearing of the jury, the defense counsel asked for a mistrial on the ground that no foundation for the question was laid. Plaintiff's counsel stated that he knew that an insurance carrier was interested in the outcome of the suit because he had gone to that company's office and had been referred to defendant's counsel. Defense counsel agreed that they were defending the case at the request of Traveler's Insurance Company, but on a reservation of rights. After considerable discussion, the court advised plaintiff's counsel that he could inquire as to employees, agents, or stockholders of Travelers. The question was to be to the entire panel and it was to be interspersed between several othe.· questions. Defendant then lodged the further objection that the period of time spent making a decision on the matter unduly emphasized the fact of insurance. The plaintiff thereupon continued his interrogation by asking three questions prior to the insurance question, and followed the insurance question with two more questions.

The right to voir dire prospective jurors as to their interest in or connection with an insurance carrier interested in the defense or prosecution of a case is well recognized. However, despite the ever increasing usage of insurance, many trial attorneys, as well as judges, believe that the knowledge that an insurance carrier is involved in the litigation on behalf of a defendant tends to increase not only the likelihood of a judgment for plaintiff, but a more substantial judgment. In conse-

quence, the courts have permitted the inquiry, but have insisted that the voir dire not unduly emphasize the fact that an insurance company does have an interest in the ·outcome of the case. The rule by which this inquiry is measured is good faith.

■ A proper procedure is to make a record (lay the foundation) prior to voir dire by inquiring on the record and out of the hearing of the jury as to the name of any insurance company or companies interested in the outcome of the case. This evidences the good faith of the attorney who seeks to voir dire on this matter. It is this foundation that was not laid in the case at bar and plaintiff's counsel had failed to establish his good faith. However, before the voir dire continued, the trial court did learn that plaintiff's counsel had actual knowledge of the name of the carrier and the court further learned that this carrier did have an interest in the outcome of the suit. The trial court thereupon concluded that the inquiry was being made in good faith and permitted further inquiry by interspersing it between other questions. A leading case on this particular point is Maurizi v. Western Coal & Mining Co., 321 Mo. 378, 11 S.W.2d 268 (1928). There, the court said, p. 274:

"The foundation is the right of a litigant to know the relation of the members of the panel to the parties and those interested in the result of the case. Counsel for plaintiff is not required to prove that an insurance company, or insurance agency, is interested before inquiring of the members if they are connected with either. He is presumed to be acting in good faith when he makes the inquiries. If it appears from the record that counsel had reasonable cause to believe an insurance company, or an insurance agency, was interested, and that he acted in good faith in making the inquiries, the sound discretion of the court in controlling and directing the examination will be sustained."

In Dooley v. Dooley, 290 S.W.2d 856 (Mo.App.1956), the plaintiff failed to lay a foundation before making inquiry. The court quoted the Maurizi case, supra, and then said, l.c. 858[3]:

"Plaintiffs' counsel obviously acted in good faith in asking the question because it was admitted that defendants carried an insurance policy with the named company. See Davidson v. Rodgers, Mo., 258 S.W.2d 648, 649. In our opinion the trial court did not abuse its discretion in refusing to discharge the jury panel and declare a mistrial, and the contention is denied."

■ In Hancock v. Light, 435 S.W.2d 695 (Mo.App.1968), a proper foundation for the voir dire on insurance was made. However, due to the division of the courtroom, part of the panel was seated on one side and the balance on the other. When counsel repeated the insurance question on both sides of the room, the defendant asked for a mistrial. In that case, the court held that whether or not respondent acted in good faith in the manner and method of making the inquiry is a matter which the trial judge may best determine. The trial judge concluded that no prejudice had occurred and the appellate court found no abuse of discretion. This case calls for the same ruling.

We now consider the remaining two points raised by defendant-appellant, as each of these points involves damages. Instruction No. 6 was MAI 4.01 and was given by the court. Since this case involved property damage only, should plaintiff have requested the court give MAI 4.02, which had been adopted at time of trial? MAI 4.02 reads: "Measure of Damages— Property Only." These words are in heavy black print. Under notes on use, it is stated: "This instruction should be used in cases involving property damage only." Since this case involves property damage only, what reason does plaintiff give for

submitting 4.01? Certainly there have been numerous decisions pointing to the policy of the courts to require strict compliance with all of the requirements of MAI. Brown v. St. Louis Public Service Company, 421 S.W.2d 255 (Mo. banc 1967); Murphy v. Land, 420 S.W.2d 505 (Mo.1967); Stewart v. City of Marshfield, 431 S.W.2d 819 (Mo.App.1968). Plaintiff contends that since a bridge does not have a *market* value, MAI 4.01 must be used if personal injury is involved, or if property *without a fair market value is involved.*

It is true that a bridge may not have a market value. Gulf, M. & O. R. Co. v. Smith-Brennan Pile Co., 223 S.W.2d 100 (Mo.App.1949). What then is the proper measure of damages? We believe it to be as stated in *Gulf,* at p. 104[5]:

"We realize, of course, that proof of 'market' value of land is not the same thing as proof of 'market' value of a railroad bridge. We also appreciate the fact that there might be no 'market' for the sale of a railroad bridge in the same sense of a 'market' for the sale of land. However, if there be a showing that there is no 'market' value of the bridge, then the difference in value to plaintiff of the bridge before and after the accident with the 'market' element omitted would be a proper showing of damages and more in accord with settled principles of the measure of damages than an ex parte list of costs of repairs such as that presented by plaintiff herein." [1]

■ Plaintiff's expert witness testified that there was no market value of bridges. Therefore, the trial proceeded on the premise that the correct measure of damages was the "difference between the value of the bridge before it was damaged and the value of the bridge after it was damaged." Had MAI 4.02 been given and modified by omitting the word "market," the instruction would have conformed not only to the purpose of MAI 4.02, but to the

1. It is of some interest to note that Gulf, M. & O. R. Co. v. Smith-Brennan Pile Co., quoted above, is quoted in the *Committee Comment* under MAI 4.02, not 4.01.

testimony as elicited from plaintiff's expert witness.

The second prong of plaintiff's position on the damage instruction is raised by this question: "If M.A.I. 4.01 is sufficiently clear to guide the jury in cases where both personal injury and property damage occur, how could M.A.I. 4.01 possibly mislead the jury where only property damage is involved?" This argument would suggest that MAI 4.02 is not needed and should be ignored. It is well to remember that ·for a period of time we had no MAI 4.02, but it was thereafter determined that a 4.02 was necessary and it was made mandatory in property damage only cases.

The thrust of plaintiff's argument is that no prejudice occurred, citing Arterburn v. Meadows, 451 S.W.2d 85 (Mo.1970), and Fowler v. Laclede Gas Company, 488 S. W.2d 934 (Mo.App.1972). In Arterburn, supra, the name "Vera V. Bland" was substituted in an instruction for the term "person." The court held that using the person's name was the equivalent to using the words "a person." In Fowler v. Laclede Gas Company, supra, the instruction which was modified was approved as being supported by the pleadings and the evidence. No case has been cited, and we know of none, that permits a party to use an instruction against the admonition of MAI directions which appear mandatory.

Plaintiff contends that it is apparent the jury was not misled by MAI 4.-01, because their verdict was for the exact amount that the evidence showed plaintiff was damaged. The only testimony offered was plaintiff's expert witness, who testified that the reasonable value of the bridge before the accident was $71,000, and the value after the accident was $43,800, a difference of $27,300. This was the amount of the verdict. If, of course, this testimony entitled plaintiff to a directed verdict as to damages, then a strong case could be made for plaintiff's position. But, the jury was not required to believe plaintiff's witness. The jury had heard the evidence that was hypothecated to the expert, and had seen the photographic exhibits. The jury may not have agreed with plaintiff's expert in all respects. The jury, on voir dire, was questioned about their knowledge of a detour. There was evidence that the road was closed for a period of time and a detour established. In fact, the plaintiff sought to prove additional damages incurred by expense in erecting and maintaining detour signs. This evidence was excluded, however, as not having been pled. The reader will note that we are here trying to ascertain whether or not defendant may have been prejudiced, and this is one of the very reasons for the adoption of MAI instructions. We quote from Brown v. St. Louis Public Service Company, supra, 421 S.W.2d at 259:

> "It was claimed therein that the error, if any, was harmless. Division No. 1 holds that the mutiple converse instructions were erroneous and points out that the direction to give only one converse for a verdict-directing instruction is a mandatory direction and must be enforced. The aim and purpose of MAI will not be served if, in violation of these specific directions, multiple converse instructions may be given, *and this court then made to search the record and in some way ascertain whether the jury verdict was thereby affected and plaintiff prejudiced.*" (Emphasis ours).

Rule 70.01(b), V.A.M.R., provides that whenever an instruction applicable in a particular case is contained in MAI, "such instruction shall be given to the exclusion of any other on the same subject." Such an error is presumptively prejudicial, and on appeal the proponent of an erroneous instruction has the burden of establishing its nonprejudice. Brown v. St. Louis Public Service Company, supra, 421 S.W.2d 255; Murphy v. Land, supra, 420 S.W.2d 505; Epps v. Ragsdale, 429 S.W.2d 798 (Mo.App.1968). This has not been done. And if, in fact, we accept plaintiff's premise, then we will have said that MAI 4.02 is unnecessary in any property damage

case, as 4.01 can perform the same function if the proper measure of damages is forthcoming from the testimony in the case. This, we are unwilling to do.

 Inasmuch as this case must be remanded for a new trial on the issue of damages, we will address ourselves but briefly to the fourth and final point raised by defendant. Defendant contends that David Kamp Marshall was permitted to testify as an expert on damages when in fact there was no proper foundation laid, and because Mr. Marshall did not qualify as an expert.

The testimony as to Mr. Marshall's experience is as follows: Mr. Marshall had 39 years experience in Missouri in the division of bridges, 17 years of that establishing locations for bridges, and the remainder in design and supervision. In the past five years, Mr. Marshall's duties had included design, estimating specific designs, revision, and reviewing designs made by others. Further, Mr. Marshall reviews all bids on bridges against the estimated costs, is familiar with the costs of construction of various types of bridges, had inspected in the last three years 100 bridges as to their condition and placed cost estimates on the replacement or repair of these bridges, and has made valuations of two toll bridges which plaintiff was taking over. Mr. Marshall also testified he was familiar with this type of bridge, that it was a standard bridge, and he had seen many like it.

Certainly the foregoing suggests that Mr. Marshall possesses knowledge and experience which would aid the ordinary jury in forming an opinion on the question of damages. See Bebout v. Kurn, 154 S.W.2d 120 (Mo.1941). Further, a proper hypothetical question was submitted to Mr. Marshall which, in our opinion, laid a sufficient foundation for the giving of an opinion as an expert on the matter. The trial court was justified in its ruling on these points.

We conclude by observing that the error in this trial resulted from the instruction on damages, and such error requiring reversal affects only the issue of the amount of damages. The cause is therefore remanded for retrial on the issue of damages only.

HOGAN, C. J., and STONE, TITUS and BILLINGS, JJ., concur.